STATE OF HAWAII, Plaintiff-Appellant, *v.* JACQUELINE L. WYATT, Defendant-Appellee

NO. 9280

(CASE 96aa. T1983-1199)
(CASE 96aa. T1983-1200)

AUGUST 16, 1984

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI AND WAKATSUKI, JJ.

294

OPINION OF THE COURT BY NAKAMURA, J.

Three questions are presented in this appeal by the State of Hawaii from an order suppressing evidence in a prosecution brought against Jacqueline L. Wyatt for Driving Under the Influence of Intoxicating Liquor in violation of Hawaii Revised Statutes (HRS) § 291-4[1] and Possessing Intoxicating Liquor While Operating a Motor Vehicle on a Public Street in violation of HRS § 291-3.1.[2] They are: (1) whether the roadside questioning of the defendant after she had been stopped for a traffic violation constituted custodial interrogation for purposes of applying the *Miranda* rule; (2) whether the results of sobriety tests administered to the defendant were excludable as evidence on grounds that "neither probable cause nor reasonable grounds" existed for the administration

---

[1] HRS § 291-4 (1976) provides:
    *Driving under influence of intoxicating liquor.*   (a) A person commits the offense of driving under the influence of intoxicating liquor if:
        (1)  The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor; or
        (2)  The person operates or assumes actual physical control of the operation of any vehicle with 0.10 per cent or more, by weight of alcohol in the person's blood.

[2] HRS § 291-3.1 (Supp. 1983) provides:
    *Consuming or possessing intoxicating liquor while operating motor vehicle.*   (a) No person shall consume any intoxicating liquor while operating a motor vehicle upon any public street, road, or highway.
        (b)  No person shall possess, while operating a motor vehicle upon any public street, road, or highway, any bottle, can, or other receptacle containing any intoxicating liquor which has been opened, or a seal broken, or the contents of which have been partially removed.
        .   .   .   .   .
        (e)  Any person violating this section shall be guilty of a misdemeanor.

of such tests; and (3) whether the seizure of evidence from the passenger compartment of her automobile was unreasonable because it was preceded by a flashlight-aided scan of the compartment. Unlike the District Court of the First Circuit, we conclude from a review of the record and relevant precepts of criminal jurisprudence that the questions call for answers in the negative. Thus, we set aside the district court's suppression order and remand the case for trial.

I.

While standing on a sidewalk abutting Kalakaua Avenue near midnight on March 13, 1983, Officers Main and Todt of the Honolulu Police Department observed an automobile, an MG convertible with its top down, being driven without lighted headlamps.[3] Officer Main thus directed the driver, Jacqueline L. Wyatt, to drive the vehicle to the curb. When she did so, the officer asked her to produce her driver's license, the vehicle's registration certificate, and her no-fault insurance card. While she rummaged through her purse for those documents, Officer Main became aware of a smell of intoxicating liquor emanating from the pas-

---

[3] Section 15-19.2 (Supp. 1983) of the Traffic Code of the City and County of Honolulu provides that "every vehicle upon a highway at any time from a half-hour after sunset to a half-hour before sunrise . . . shall display lighted lamps and illuminating devices" as required by the Code. Section 15-19.15 requires vehicles to be equipped with at least two headlamps.

The Code's penalty provision reads as follows:

Sec. 15-26.10 (1976). *Penalty.*

(1) Except as provided in this Traffic Code, it is a misdemeanor for any person to violate any of the provisions of this Traffic Code unless the violation is by other law of this State declared to be a felony.

(2) Every person who violates any provision of this Traffic Code for which another penalty is not provided, shall for a first conviction thereof be fined not more than $100 or imprisoned not more than ten days; for conviction of a second offense committed within one year after the date of the first offense, the person shall be fined not more than $200 or imprisoned not more than twenty days, or by both fine and imprisonment; for conviction of a third or subsequent offense committed within one year after the date of the first offense, the person shall be fined not more than $500 or imprisoned not more than six months, or by both fine and imprisonment.

senger compartment of the automobile. So he asked if she had been drinking, which she readily admitted. She told him she had a drink earlier that night and then volunteered she had been cited for three traffic violations a few minutes earlier.[4] At this juncture, the officer ordered her to alight from the car and proceeded to administer a field sobriety test. When it indicated she might have been driving while under the influence of intoxicants, she was arrested for violating HRS § 291-4.

Meanwhile, Officer Todt, who had been directing traffic around the parked convertible, approached the vehicle's left rear and noticed a green bottle behind the driver's seat. He used his flashlight to obtain a better view of the passenger compartment and saw two empty bottles he instantly recognized as containers of a particular brand of beer, Moosehead. Looking further with the aid of the flashlight, he saw what appeared to be a bottle of vodka, half-full, between the two front seats. By then, Officer Main had arrested the defendant and directed her to a police car for transport to the police station.

Officer Todt continued to scan the passenger compartment after the defendant had been ordered from her vehicle and found two open Diet Pepsi cans smelling of alcohol and another empty Moosehead beer bottle. He seized all of the beverage containers. And when the defendant was booked at the police station, she was also charged with possessing opened containers of intoxicating liquors while operating a motor vehicle on a public street.

---

[4] The Traffic Code of the City and County of Honolulu does not mandate the physical arrest of a violator. Sec. 15-26.1 of the Code (1976) provides a procedure whereby a violator is issued a summons or citation in writing in lieu of physical arrest; it reads:

> Except when authorized or directed under State law to immediately take a person arrested for a violation of any of the traffic laws before a magistrate, any authorized police officer, upon making an arrest for violation of the State traffic laws or Traffic Code and ordinances of the City and County of Honolulu, shall take the name, address, and operator's license number of the alleged violator and the registered number of the motor vehicle involved and shall issue to him in writing a summons or citation, hereinafter described, notifying him to answer to the complaint to be entered against him at a place and at a time provided in said summons or citation.

Therefore, a person stopped for an alleged traffic violation is usually detained only long enough to enable the police officer to issue a citation.

Prior to trial the defendant moved to exclude as evidence the admission that she had consumed an alcoholic beverage on the night of her arrest, the results of the field sobriety test and a subsequent intoxilyzer test administered at the police station, and the empty beer bottles and half-empty vodka bottle seized from her vehicle. The district court excluded the statement because the defendant had not been apprised of her *Miranda* rights before being asked if she had been drinking; it suppressed the test results because it found "neither probable cause nor reasonable grounds for requiring the defendant to step out of the car to take a field test" existed when she was asked to do so; and it ruled the beverage containers were excludable as evidence because Officer Todt's flashlight-aided scan of the passenger compartment, in its opinion, constituted an unreasonable search. The State perfected a timely appeal of the suppression order to this court pursuant to HRS § 641-13(7).

## II.

Our analysis of the issues posed for decision begins with the roadside questioning of the defendant after she was stopped for operating a motor vehicle on a street in Waikiki without lighted headlamps in violation of the City's traffic code.

## A.

"[T]he government seeking to punish an individual [must] produce the evidence against [her] by its own independent labors, rather than by the cruel, simple expedient of compelling it from [her] own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460 (1966); *State v. Russo,* 67 Haw. 126, 131-32, 681 P.2d 553, 558 (1984). And the rule that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *Miranda v. Arizona,* 384 U.S. at 444 (emphasis added), applies even where the object of the prosecution is to establish the commission of "a misdemeanor traffic offense." *Berkemer v. McCarty,* _____ U.S.

_____, _____, 104 S. Ct. 3138, 3144 (1984).[5]

Whether interrogation was carried on in a custodial context is dependent on the totality of circumstances surrounding the questioning, *State v. Paahana,* 66 Haw. 499, 503, 666 P.2d 592, 595 (1983); *State v. Melemai,* 64 Haw. 479, 481, 643 P.2d 541, 544 (1982). The relevant circumstances, we have said, include "the time, place and length of the interrogation, the nature of the questions asked, [and] the conduct of the police at the time of the interrogation." *State v. Paahana, supra.* But the ultimate test is whether the questioning was of a nature that "would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis,* 446 U.S. 291, 299 (1980) (quoting *Miranda v. Arizona,* 384 U.S. at 457-58). Judged by this standard, the roadside questioning that led to the utterance of an inculpatory statement by the defendant did not rise to the level of interrogation calling for *Miranda warnings.*

### B.

The questioning followed a stop of defendant's automobile and her detention by the police. We are instructed by the Supreme Court that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440

---

[5] The issues in *Berkemer v. McCarty* were whether *Miranda* "govern[ed] the admissibility of statements made during custodial interrogation by a suspect accused of a misdemeanor traffic offense" and whether "the roadside questioning of a motorist detained pursuant to a traffic stop constitute[d] custodial interrogation for the purposes of a doctrine enunciated in *Miranda*." _____ U.S. at _____, 104 S. Ct. at 3142.

In answering the first question the Court held "that a person subjected to custodial interrogation is entitled to the benefits of the procedural safeguards enunciated in *Miranda,* regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." *Id.* at _____, 104 S. Ct. at 3148. In answering the second, the Court found nothing in the record indicating the defendant should have been given *Miranda* warnings prior to his arrest and held the initial stop of the defendant's car, by itself, did not render him "in custody." *Id.* at _____, 104 S. Ct. at 3152.

U.S. 648, 653 (1979) (citations omitted); *cf. State v. Ogata,* 58 Haw. 514, 516, 572 P.2d 1222, 1224 (1977) (stopping the vehicle in which defendants were riding was a seizure of their persons). But the seizure of the defendant here was by no means unreasonable.

The unlighted headlamps of the MG convertible furnished the police officers with ample grounds to stop the vehicle and to detain the driver. The obvious violation of the Traffic Code gave them reason to seek information necessary for the issuance of a citation. *See* note 4 *supra.* During an interlude in this authorized procedure, while the defendant sought the documents requested of her, one of the officers found reason to also suspect she could have been operating the vehicle under the influence of intoxicating liquors.

The succeeding question, asked without the defendant being apprised of her right to remain silent or being given any of the other warnings decreed by *Miranda,* brought an incriminating response. The record, however, does not reflect that the officer may have been motivated by subterfuge or trickery in putting the question to her. Quite to the contrary, his query was a direct and simple one marked by spontaneity. More importantly, the record does not reveal the intimidating or inherently coercive factors usually extant when interrogation is conducted in a custodial setting. Rather, what transpired here may be more aptly described as on-the-scene questioning of brief duration conducted prior to arrest in public view.[6] In short, the circumstances surrounding the incident cannot support an inference that *Miranda* rights were triggered yet ignored; for nothing in the record suggests the setting was custodial or that the interrogation was of a nature likely to subjugate the defendant to the will of her examiner and undermine the constitu-

---

[6] If the defendant had been arrested before being asked if she had been drinking, *Miranda* warnings were clearly in order. For as the Court said in *Berkemer:*

It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' *California v. Beheler,* 463 U.S. ___, ___, 103 S. Ct. 3517, 3519, 77 L. Ed. 2d 1275 (1983) *(per curiam).* If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him in 'custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.* See *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) *(per curiam).*
___ U.S. at ___, 104 S. Ct. at 3151.

tionally guaranteed privilege against self-incrimination. *State v. Paahana, supra; State v. Melemai, supra.*[7]

### III.

Having decided that the district court erred in concluding *Miranda* warnings were required before the defendant was asked if she had been drinking, we next consider whether the results of the sobriety tests should have been suppressed.

### A.

The field sobriety test was preceded by the observation of a vehicle with its lights off, a valid stop of the vehicle, the discovery that it reeked of alcoholic beverages, and the driver's statements that she had been issued three traffic citations and had consumed an alcoholic beverage earlier. These circumstances in the district court's opinion gave the police officer no cause to order the defendant from the automobile and to direct the performance of a sequence of movements likely to provide clues on the extent to which her faculties might have been impaired by the consumption of intoxicating liquor.[8] We think the court clearly erred in this regard too.

---

[7] In *Berkemer* the parties urged the Court to adopt a bright-line rule favoring their respective positions. The Court acknowledged that "[e]ither a rule that *Miranda* applies to all traffic stops or a rule that a suspect need not be advised of his rights until he is formally placed under arrest would provide a clearer, more easily administered line." ____ U.S. at ____, 104 S. Ct. at 3151. However, the Court did not adopt a bright-line rule. Instead, it found there was nothing in the record indicating the defendant should have been given *Miranda* warnings prior to his arrest. *Id* at ____, 104 S. Ct. at 3152. Thus, the circumstances surrounding the interrogation are still dispositive of the question.

[8] The record indicates the field test administered by the officer included the following:

(a) The arch back test which requires the driver to stand with her back arched and her eyes closed; (b) the heel walk test where the officer requests the driver to take six steps down, turn to the right, and take seven steps back. Each step requires contact between the heel of one foot and the toe of the other foot; and (c) the leg lift test where the driver places her hands behind her head, interlocking her fingers, lifts one leg fifteen inches off the ground and holds it straight ahead of her for fifteen seconds. Transcript, at 12 and 29.

If the suspected driver "fails" a field sobriety test, formal arrest usually follows.

"[F]ield sobriety tests are designed and administered to avoid the shortcomings of casual observation. 1 Am. J. Crim. L. 96 (1967)." *State v. Arsenault,* 115 N.H. 109, 111, 336 A.2d 244, 246 (1975). "They are premised upon the relationship between intoxication and the externally manifested loss of coordination it causes." *Id.* at 113, 336 A.2d at 247. They essentially require a suspected driver to go through prescribed routines so his physical characteristics may be observed by the police. We cannot deny they have a purpose of gathering evidence of the driver's criminal conduct. Yet, the privilege against self-incrimination is not necessarily implicated whenever a person suspected of criminal activity is compelled in some way to cooperate in developing evidence which may be used against him. *See e.g., United States v. Dionisio,* 410 U.S. 1, 5-7 (1973) (the compelled production of voice exemplars would not violate the Fifth Amendment); *Gilbert v. California,* 388 U.S. 263, 266-67 (1967) (the taking of handwriting exemplars did not violate petitioner's constitutional rights); *Schmerber v. California,* 384 U.S. 757 (1966) (the taking of a blood sample over objection of driver suspected of driving while intoxicated did not violate his Fifth Amendment rights).

In *Schmerber* the state forced the defendant to submit to the withdrawal and chemical analysis of his blood. In effect, it "compelled him to submit to an attempt to discover evidence" which was used later to convict him of driving under the influence of intoxicating liquor. 384 U.S. at 761. The Supreme Court, however, found no Fifth Amendment violation; it drew a distinction between extorting "communications" or "testimony" from a suspect and making him the source of "real or physical evidence," stating:

> It is clear that the protection of the privilege [against self-incrimination] reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd v. United States,* 116 U.S. 616. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different

ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it.

384 U.S. at 763-64 (footnote omitted).

The State of Hawaii sought neither "communications" nor "testimony" from Jacqueline Wyatt. What it sought of her was an exhibition of "physical characteristics of coordination," *State v. Arsenault,* 115 N.H. at 113, 336 A.2d at 247, since she was a possible source of physical evidence. Consequently, the field sobriety test was not rendered infirm by the constitutionally guaranteed privilege against compulsory self-incrimination. *Cf. State v. Martin,* 62 Haw. 364, 375, 616 P.2d 193, 200 (1980) (compulsion to produce handwriting exemplars does not contravene the privilege against self-incrimination); *State v. Severino,* 56 Haw. 378, 381, 537 P.2d 1187, 1189 (1975) (a person suspected of driving under the influence of intoxicants is not entitled to *Miranda* warnings before being required to submit to chemical tests prescribed by statute). Nor was the defendant's right to be secure against unreasonable searches, seizures, and invasions of privacy infringed here.

B.

"The overriding function of the Fourth Amendment [and article I, section 7 of the Hawaii Constitution] is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. at 767. The values they protect overlap those protected by the self-incrimination clauses of the federal and state constitutions. *Id.* Yet it does not follow from our earlier ruling that the constitutional proscriptions of unreasonable searches, seizures, and invasions of privacy also were not implicated in the field sobriety test. "As the Court made clear in *Schmerber,* . . . the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels — the 'seizure' of the 'person' necessary to bring him into contact with government agents, . . . and the subsequent search for and seizure of the evidence." *United States v. Dionisio,* 410 U.S. at 8 (citations omitted). *Cf. Terry v. Ohio,* 392 U.S. 1, 16-17 (1968) (whenever a police officer restrains a person's freedom to walk away he has "seized"

that person; a careful exploration of the outer surfaces of the person's clothing in an attempt to find weapons is a "search.").

The defendant's initial seizure is, of course, not in issue; it was a valid traffic stop. But she was later ordered to step out of her automobile and subjected to a test designed to yield evidence of intoxication. The validity of this "seizure"[9] and test for sobriety turns on whether there was cause for further detention and the manner in which the quest for evidence of drunkenness was carried out.

A rule of search and seizure jurisprudence holds "that an official seizure of the person must be supported by probable cause, even if no formal arrest is made." *Michigan v. Summers,* 452 U.S. 692, 696 (1981). But in *Terry v. Ohio, supra,* the Supreme Court established "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers,* 452 U.S. at 698. *Terry* and subsequent decisions adopting and extending its reasoning "recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699. *See United States v. Cortez,* 449 U.S. 411, 421 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881-82 (1975); *Adams v. Williams,* 407 U.S. 143, 146 (1972); *Terry v. Ohio,* 392 U.S. at 20-22.

What have been sanctioned thereby are investigative stops. We are concerned with one here. "The reasonableness of a[n investi-

---

[9] Citing *Pennsylvania v. Mimms,* 434 U.S. 106 (1977), the State argues that once a motor vehicle has been stopped for a traffic violation, the police may, without more, order the driver to get out of the vehicle. If the case stands for the broad proposition urged by the State, we are not prepared, "as the ultimate judicial tribunal" with "final, unreviewable authority to interpret and enforce the Hawaii Constitution," *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974), to hold that a valid traffic stop of itself provides reason to order the driver to get out of the vehicle. Article I, section 7 of the Hawaii Constitution, which protects the right of the people of Hawaii to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy, is not subject to the reading urged upon us.

gative] stop turns on the facts and circumstances of each case."
*United States v. Mendenhall,* 446 U.S. 544, 561 (1980) (Powell, J.,
concurring). And "[i]n particular, the Court has emphasized (i) the
public interest served by the seizure, (ii) the nature and scope of the
intrusion, and (iii) the objective facts upon which the law enforce-
ment officer relied in light of his knowledge and expertise. See
*Brown v. Texas,* 443 U.S. 47, 50-51 (1979); *Delaware v. Prouse,* 440
U.S. 648, 654-655 (1979); *United States v. Brignoni-Ponce,* 422 U.S.
873, 879-883 (1975); *Terry v. Ohio, supra,* at 20-22." *Id.*

We need not belabor the nature of the public interest served by
the seizure; substantial law enforcement interests undoubtedly
were at stake. Moreover, the specific and articulable facts then
available to the officer warranted a man of reasonable suspicion to
think the defendant may well have operated a motor vehicle while
under the influence of intoxicating liquors. What was gathered
after the initial intrusion into privacy, which otherwise would have
been of short duration, justified the command for the defendant to
alight.

The intrusion, however, also encompassed a directive that the
defendant execute a prescribed physical routine. That this had a
purpose of gathering proof of criminal activity has been noted.
Still, the test "involve[d] none of the probing into an individual's
private life and thoughts that marks an interrogation or a search
for concealed evidence of criminal activity." *People v. Helm,* Colo.,
633 P.2d 1071, 1080 (1981) (Rovira, J., concurring). It only en-
tailed a display of transitory physical characteristics associated with
inebriation. In our view these facts and circumstances rendered
reasonable a seizure comprehending a sobriety test, though the
probable cause supporting a formal arrest may not have been pres-
ent.[10] Thus, there was no breach of the Fourth Amendment or
article I, section 7 of the Hawaii Constitution. *Cf. United States v.
Place,* 462 U.S. 696, ____, 103 S. Ct. 2637, 2644-45 (1983) (a
"canine sniff" of defendant's luggage was not a "search" within the
meaning of the Fourth Amendment); *State v. Snitkin,* 67 Haw. 168,

---

[10] Since the field sobriety test was valid, there was probable cause to arrest the
defendant and compel her to undergo chemical testing pursuant to "the implied
consent" law, HRS § 286-151.

171, 681 P.2d 980, 983 (1984) (a narcotics dog's sniff of the airspace around a closed container was not a Fourth Amendment or article I, section 7 "search."); *State v. Groves,* 65 Haw. 104, 112-13, 649 P.2d 366, 372 (1982) (the use of a narcotics-sniffing dog to detect narcotics in a person's luggage was not an illegal search); *State v. Martin,* 62 Haw. at 375, 616 P.2d at 200 (compulsion to produce handwriting exemplars did not transgress the Fourth Amendment).

## IV.

We turn finally to the State's claim that the district court erred in suppressing the beverage containers seized from the MG convertible. The court ruled the use of a flashlight rendered the search unreasonable. But again we agree the evidence should not have been suppressed.

The district court concluded the officer's scan of the passenger compartment of the MG convertible with the aid of a flashlight was an unreasonable search. "[W]hile implications of a search are inherent in any quest for evidence by the police, no one has ever suggested that every instance of such seeking is a 'search' in the constitutional sense." *State v. Kapoi,* 64 Haw. 130, 139, 637 P.2d 1105, 1112 (1981) (citation omitted). For "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of [constitutional] protection. *See Lewis v. United States,* 385 U.S. 206, 210; *United States v. Lee,* 274 U.S. 559, 563." *Katz v. United States,* 389 U.S. 347, 351-52 (1967).

"[W]here the object observed by the police is in 'open view,' it 'is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution.' " *State v. Kapoi,* 64 Haw. at 140, 637 P.2d at 1113. Here, Officer Todt noticed a dark object on the floor of the open automobile from a vantage point on a busy public street. He thereafter used a flashlight to confirm an initial impression that the object was an opened bottle of beer, and also observed other opened containers of alcoholic beverages. The district court deemed the scan of the vehicle's interior unreasonable because a flashlight was employed.

But "the fact that the visual inspection was aided by a flashlight did not convert the scan of the vehicle's interior into a constitu-

tionally regulated 'search.' *State v. Haili,* 63 Haw. 553, 555, 632 P.2d 1064, 1065 (1981); *State v. Hanawahine,* 50 Haw. 461, 466, 443 P.2d 149, 152 (1968). *See also United States v. Booker,* 461 F.2d 990, 992 (6th Cir. 1972); *United States v. Kim,* 430 F.2d 58, 61 (9th Cir. 1970); *State v. Stone,* 294 A.2d 683 (Me. 1972); *State v. Riley,* 240 Or. 521, 523, 402 P.2d 741, 743 (1965)." *Id.* Hence, the officer's observation of the bottles that were eventually seized was not subject to constitutional regulation, and there was no basis for the district court to examine it for reasonableness.

The district court's order is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

*Gary A. Modafferi (Arthur E. Ross* on the briefs), Deputy Prosecuting Attorneys, for appellant.

*Mark R. Zenger,* Deputy Public Defender, for appellee.