**Electronically Filed
Supreme Court
SCWC-19-0000563
03-JUN-2022
09:42 AM
Dkt. 19 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellant,

vs.

DANIEL IRVING JAMES MANION,
Petitioner/Defendant-Appellee.

SCWC-19-0000563

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000563; CASE NO. 1DTA-19-00266)

JUNE 3, 2022

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND EDDINS, JJ., WITH
EDDINS, J., CONCURRING SEPARATELY, WITH WHOM McKENNA, J., JOINS,
AND WILSON, J., DISSENTING

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

When evidence is obtained against a criminal defendant

in contravention of constitutional protections, such as when

police subject a suspect to custodial interrogation without

first giving Miranda[1] warnings as required by article I, section 10 of the Hawai'i Constitution, that evidence must be suppressed. Evidence obtained after the illegality, acquired because of officers' exploitation of that illegality, must likewise be suppressed, as such evidence is fruit of the poisonous tree.

Here, defendant Daniel Irving James Manion was subject to custodial interrogation during a roadside investigation for operating a vehicle under the influence of an intoxicant (OVUII). But the evidence gathered after that illegality – specifically, his performance on the standardized field sobriety test (SFST) – was neither testimonial,[2] nor the fruit of the poisonous tree. The police did not exploit the illegal interrogation because the interrogation did not lead to the discovery of the SFST evidence; the investigation had already been directed to the SFST before any illegality.

Manion's performance on the SFST was accordingly admissible despite the absence of Miranda warnings preceding the test.

---

[1]     Miranda v. Arizona, 384 U.S. 436 (1966).

[2]     We decline to revisit our holding in State v. Uchima, 147 Hawai'i 64, 85, 464 P.3d 852, 873 (2020), that a person's performance on the SFST is not testimonial.

## II.  BACKGROUND

### A.  District Court Proceedings

Manion was arrested in Hawai'i Kai in the early hours of January 4, 2019, after a resident of the neighborhood heard a car crash into a parked vehicle and called the Honolulu Police Department (HPD).  The police arrived to find Manion in the driver's seat of a damaged car, from which a fluid trail led to the damaged parked vehicle.  After initial inquiry into whether Manion was hurt, the officer came to suspect he had been driving while intoxicated, administered the SFST on Manion, and arrested him.

Manion was charged with OVUII in violation of Hawai'i Revised Statutes (HRS) § 291E-61(a)(1) (2020)[3] in the District Court of the First Circuit.[4]  Manion moved to suppress any statements he made during the encounter with police that led to his arrest for lack of <u>Miranda</u> warnings.  The district court held a hearing on the motion in which three HPD officers involved in the investigation, along with the Hawai'i Kai

---

[3]     HRS § 291E-61(a)(1) provides:

> (a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:
>     (1) While under the influence of alcohol in an amount
>         sufficient to impair the person's normal mental
>         faculties or ability to care for the person and
>         guard against casualty[.]

[4]     The Honorable Summer M. M. Kupau-Odo presided.

3

resident who heard the crash, testified as to the following facts (as found by the district court in its written order):

1.      On January 4, 2019, at approximately 4:40 a.m., while patrolling the Hawai'i Kai area, [HPD] Officer Corey Morgan ("Officer Morgan") responded to a report of a motor vehicle collision at Kealahou Street and K[ī]p[ū]kai Place. While other officers went to locate the vehicle that reportedly had been struck, Officer Morgan went to locate the "unit 1" vehicle that reportedly caused the crash, which the caller said might be on K[ī]p[ū]kai Place.

2. On K[ī]p[ū]kai Place, Officer Morgan found a white Hyundai with extensive and severe front-end damage. Defendant was the lone occupant of the Hyundai and was seated in the driver's seat.  Officer Morgan observed a fluid trail from Defendant's Hyundai leading to the parked vehicle that was struck on Kealahou Street less than two blocks away.

3. Officer Morgan approached Defendant and asked if he was okay, if he was injured, if he needed an ambulance, and where was he coming from.  This initial exchange was brief – lasting a few seconds - as Officer Morgan tried to determine if Defendant needed medical attention.  Defendant responded that he was okay.  He also explained that after a "rough day," he had gone to [Sandy Beach, also known as Sandy's,] and drank a "40" and was heading home.  Defendant further explained that he was texting and that is what caused the accident, not his prior drinking.

4. During this brief encounter, Officer Morgan observed Defendant to have red and watery eyes and a strong odor of an alcoholic beverage coming from his breath.

5. Believing, upon observing the indicia of alcohol, that he had probable cause to arrest Defendant for [OVUII], Officer Morgan asked Defendant if he would be willing to participate in a [SFST].  Defendant agreed and stepped outside of his vehicle.  Defendant was not free to leave.

6. Officer Morgan would not have administered the SFST without first asking Defendant if he agreed to participate in the SFST and receiving Defendant's "yes" answer.

7. Prior to administering the SFST, Officer Morgan asked Defendant questions referred to as the Medical Rule Out ("MRO") questions, including whether Defendant was taking any medications or whether he was under the care of a doctor or dentist.  Officer Morgan asked the questions to rule out causes, other than alcohol, that could affect Defendant's performance on the SFST.  Defendant answered "no" to the MRO questions.

4

8. Officer Morgan would not have administered the SFST without first asking the MRO questions.

9. The SFST consists of three tests that are administered in a particular order - Horizontal Gaze Nystagmus ("HGN") first, Walk and Turn ("W&T") second, and One Leg Stand ("OLS") third.

10. Prior to beginning the tests, Officer Morgan told Defendant he would be judged on how well he follows the instructions for each of the three tests. Before administering each of the three tests, Officer Morgan instructed Defendant on how to perform the test. Each time after instructing Defendant, Officer Morgan asked Defendant if he understood the instructions and whether he had any questions. For each of the three tests, Defendant indicated he understood the instructions and he had no questions.

11. Officer Morgan would not have administered each of the three tests if he had not received Defendant's responses that he understood the instructions for the tests and had no questions.

12. After Officer Morgan obtained Defendant's agreement to participate in the SFST, Defendant's responses to the MRO questions, and Defendant's affirmative responses that he understood the instructions for each of the three tests, Officer Morgan had Defendant perform the HGN, W&T, and OLS.

13. Following the SFST, HPD Officer Landon Miyamura ("Officer Miyamura") offered Defendant the Preliminary Alcohol Screening and then arrested Defendant for OVUII.

14. At the main station, Officer Miyamura administered the intoxilyzer test to Defendant. Upon completion of the test, Officer Miyamura showed Defendant the print-out from the intoxilyzer, pointed out Defendant's breath-test result, and stated, "This is your result." Defendant responded: "That's impossible, I only had one '40' and two fireball shots in three hours."

15. At no point in time did either officer tell Defendant he had the right to remain silent and anything he said could be used against him. Defendant was never advised of any of his Miranda rights.

The district court granted the motion to suppress, concluding that Manion was subjected to custodial interrogation without Miranda warnings. The court first determined that

5

Manion was not in custody during the initial exchange with Officer Morgan, and accordingly, Manion's statements "admitting to drinking a '40' at Sandy's and then explaining that his texting, as opposed to drinking, caused the accident" were admissible. However, the district court concluded Manion was in custody after that initial exchange, and that he was subjected to custodial interrogation when Officer Morgan (1) asked Manion if he would be willing to participate in the SFST, (2) asked him the medical rule-out questions, and (3) asked him whether he understood the SFST instructions or had any questions about the tests. As a result, the district court concluded that Manion's "performance on the SFST is inadmissible fruit of the poisonous tree."[5]

## B.   Intermediate Court of Appeals (ICA) Proceedings

The State appealed, and the ICA affirmed in part and vacated in part in a memorandum opinion. As relevant here, the ICA concluded that Manion was in custody based on the State's concession at the motion to suppress hearing. Namely, "that Officer Morgan had probable cause to arrest Manion for OVUII after their initial exchange and before Officer Morgan asked

---

[5]   The district court also suppressed Manion's statements after the breath test ("That's impossible, I only had one '40' and two fireball shots in three hours") as the product of a separate violation (showing Manion the intoxilyzer results after his arrest without Miranda warnings). The ICA affirmed this conclusion, which is not at issue here.

Manion if he would participate in the SFST."[6]  The ICA next determined that "the defendant's performance on the [S]FST did not constitute an interrogation requiring Miranda warnings" pursuant to our decision in Uchima, 147 Hawai'i at 84-85, 464 P.3d at 872-73, in which we held that the SFST was nontestimonial.  Likewise, the ICA relied on Uchima to hold that "[a]sking Manion whether he was willing to participate in the SFST, whether he understood the instructions to the SFST, and whether he had any questions did not implicate his right to self-incrimination and did not constitute interrogation[.]"

However, the ICA followed its published opinion in State v. Sagapolutele-Silva, 147 Hawai'i 92, 101-03, 464 P.3d 880, 889-91 (App. 2020), and held that the medical rule-out questions were interrogation.  The ICA did not address the argument that the SFST was the fruit of the medical rule-out questions.

C.   **Supreme Court Proceedings**

Both the State and Manion filed applications for writ of certiorari seeking review of the ICA's memorandum opinion.

---

[6]     The State's application for writ of certiorari (which we rejected in any event) did not contest the custody holding and indeed explicitly conceded it.  For purposes of this opinion, therefore, Manion was in custody at all relevant times.

We rejected the State's application and accepted Manion's.[7] Manion asks this court to consider whether the ICA erred by "failing to suppress all evidence and statements obtained after the Medical Rule-Out [] questions as the 'fruit of the poisonous tree[.]'"  He also urges us to revisit our recent holding in Uchima, 147 Hawaiʻi at 84-85, 464 P.3d at 872-73, that "the SFST does not seek 'communications' or 'testimony,'" arguing that Uchima's reliance on State v. Wyatt, 67 Haw. 293, 687 P.2d 544 (1984), was misplaced because the SFST has changed since Wyatt was decided.

### III. STANDARD OF REVIEW

> "We review questions of constitutional law under the 'right/wrong' standard."  State v. Jenkins, 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000) (citing State v. Toyomura, 80 Hawaiʻi 8, 15, 904 P.2d 893, 900 (1995)).  Accordingly, "we review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'"  State v. Kauhi, 86 Hawaiʻi 195, 197, 948 P.2d 1036, 1038 (1997) (citing State v. Navas, 81 Hawaiʻi 113, 123, 913 P.2d 39, 49 (1996)).

State v. Lee, 149 Hawaiʻi 45, 49, 481 P.3d 52, 56 (2021) (brackets omitted).

---

[7]  Because we rejected the State's application for writ of certiorari, which challenged the holding that the medical rule-out questions were interrogation, the question of whether there was an "illegality" at all is not before us.  Nevertheless, the holding that the medical rule-out questions were interrogation was correct, as we explained in State v. Skapinok, SCWC-19-0000476 (Haw. 2022).

## IV. DISCUSSION

The exclusionary rule is "a judicially created remedy designed to safeguard against future violations of [constitutional] rights." Arizona v. Evans, 514 U.S. 1, 10 (1995). "The Hawai'i exclusionary rule serves the dual purposes 'of deterring governmental officials from circumventing the protections afforded by the Hawai'i Constitution' and of 'protecting the privacy rights of our citizens.'" Lee, 149 Hawai'i at 49, 481 P.3d at 56 (brackets omitted) (quoting State v. Lopez, 78 Hawai'i 433, 446, 896 P.2d 889, 902 (1995)). Accordingly, when evidence is obtained "as a result of the exploitation of a previous illegal act of the police," it, too, must be suppressed as "the fruit of the poisonous tree," in order to ensure adequate deterrence of police actions that violate the constitution. Id.

### A.    The SFST Was Not the Fruit of the Illegality

We first address whether the evidence obtained after the illegality – here, asking the medical rule-out questions while Manion was in custody without Miranda warnings, which contravened article I, section 10 of the Hawai'i Constitution[8] – was tainted by the Miranda violation and therefore must be Alth

---

[8]    "No person shall . . . be compelled in any criminal case to be a witness against oneself."  Haw. Const. art. I, § 10.

of the poisonous tree.[9]  In particular, Manion argues that

"Manion's responses during the SFST and performance of the SFST"

(to which we will refer collectively as "the SFST") must be

suppressed.  We disagree.

> "[T]he 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police.'"  State v. Fukusaku, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997) (quoting State v. Medeiros, 4 Haw. App. 248, 251 n.4, 665 P.2d 181, 184 n.4 (1983)).  "Under the fruit of the poisonous tree doctrine, [a]dmissibility is determined by ascertaining whether the evidence objected to as being 'fruit' was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint."  State v. Poaipuni, 98 Hawai'i 387, 392–93, 49 P.3d 353, 358–59 (2002) (alteration in original) (quoting Fukusaku, 85 Hawai'i at 475, 946 P.2d at 45).

> . . . .

> "In other words, the ultimate question that the fruit of the poisonous tree doctrine poses is as follows: Disregarding the prior illegality, would the police nevertheless have discovered the evidence?"  Id. at 393, 49 P.3d at 359. . . .

> Accordingly, the State's burden is to demonstrate that [the purported fruit] is not a benefit gained or an advantage derived by the police from the prior illegality or that the subsequent statement has become sufficiently attenuated from the initial illegality so as to purge the taint.

State v. Trinque, 140 Hawai'i 269, 281, 400 P.3d 470, 482 (2017).

---

[9]     We note that Manion squarely raised the fruits doctrine in his answering brief to the ICA, but the ICA's memorandum opinion did not address it.  We ultimately agree with the result the ICA reached.  But because fruit of the poisonous tree, if applicable, would require suppression of evidence acquired after the Miranda violation irrespective of whether that evidence was the product of interrogation, the ICA erred by failing to evaluate whether the fruits doctrine applied.

Here, the SFST was not an "exploitation of the previous illegality," Poaipuni, 98 Hawai'i at 392, 49 P.3d at 358, or a "benefit gained or an advantage derived" from the Miranda violation.  Trinque, 140 Hawai'i at 281, 400 P.3d at 482.  That the State cannot exploit or derive an advantage from a constitutional violation reflects the principle that adequately deterring police misconduct, a key purpose of the exclusionary rule, requires ensuring that police cannot profit from a constitutional violation by gaining an undue investigative edge that they would not have otherwise had.  Elkins v. United States, 364 U.S. 206, 217 (1960) ("The [exclusionary] rule is calculated . . . to deter – to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it.").  But subsequently obtained evidence may not be an exploitation of the illegality if it "did not lead the officers to search for th[e allegedly tainted] evidence nor direct any investigation into its discovery."  Lee, 149 Hawai'i at 50, 481 P.3d at 57.  In Lee, for instance, the defendant had locked himself in his bedroom, and his family, fearful of a suicide attempt, called the police.  Id. at 48, 481 P.3d at 55.  The police opened his bedroom door, which we assumed to be a constitutional violation, and the defendant assaulted the police officers.  Id. at 48-49, 481 P.3d

at 55-56.  We held that evidence obtained after the illegal entry was not the fruit of the poisonous tree because the police did not "exploit that illegal entry to procure the relevant evidence – their observations of Lee's actions."  Id. at 50, 481 P.3d at 57.  Although the police would not have gathered that evidence but for the constitutional violation (they could not have observed the defendant without opening the door), they were neither led "to search for" nor "direct[ed]" to discover that evidence because of the constitutional violation.  Id.

Although they immediately preceded the SFST in time, the medical rule-out questions did not give the officers information that "le[d] [them] to search for" evidence of intoxication, nor did the medical rule-out questions pique their suspicions such that their investigation was "direct[ed]" towards discovering evidence of intoxication.  Id.  Rather, the police decided to administer the SFST before committing the Miranda violation – the district court's findings of fact reflect that Officer Morgan asked Manion to participate in the SFST, and Manion agreed, prior to any interrogation (the medical rule-out questions).  The officers did not exploit the illegality by continuing to gather evidence that they had already set out to gather.

Manion argues that the medical rule-out questions were "a necessary predicate to the administration of the SFST. Indeed, the validity of the conclusion that a subject's performance on the SFST indicated intoxication was contingent upon negative answers to the MRO questions." This argument is unpersuasive. Although the district court found as a factual matter that "Officer Morgan would not have administered the SFST without first asking the MRO questions," Officer Morgan's investigation was already "direct[ed]" to the SFST before the medical rule-out questions, as he obtained Manion's consent to administer the SFST before the interrogation. Lee, 149 Hawai'i at 50, 481 P.3d at 57. In Lee, the police would not have observed the defendant without first opening the door, which we assumed was a constitutional violation. Id. Here, as in Lee, that Officer Morgan would not have continued with the SFST absent asking the medical rule-out questions does not render the SFST an "exploitation of the prior illegality." Poaipuni, 98 Hawai'i at 392, 49 P.3d at 358. The medical rule-out questions did not point the officers toward the evidence they would discover from the SFST, even if certain answers to those questions (or failing to ask them at all) may have impacted whether they could administer the test as a practical matter. And though the answers to the questions provided information

germane to the SFST (which is, indeed, why they constitute interrogation, see State v. Skapinok, SCWC-19-0000476, at \*36 (Haw. 2022)), that the illegally-obtained evidence is relevant to interpreting subsequently-obtained evidence does not mean that discovery of the latter "exploit[s]" the former.  Poaipuni, 98 Hawai'i at 392, 49 P.3d at 358.

Accordingly, the SFST was not fruit of the poisonous tree.

## B.   A Suspect's Performance on the SFST Is Not Testimonial

"The privilege against self-incrimination is a bar against compelling communications or testimony."  Uchima, 147 Hawai'i at 84, 464 P.3d at 872 (brackets and quotation marks omitted) (quoting Wyatt, 67 Haw. at 303, 687 at 551). Accordingly, if performance on the SFST is testimonial, it, like the answers to the medical rule-out questions, would constitute statements adduced in violation of Miranda.[10]  But as we settled in Wyatt and recently reaffirmed in Uchima, performance on the SFST is not testimonial.

"[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a

---

[10]     In this way, the theory that the SFST is testimonial would independently require suppression of that evidence as a new Miranda violation, separate and apart from the (ultimately unsuccessful) argument that the SFST is the fruit of an earlier Miranda violation.

factual assertion or disclose information." Pennsylvania v. Muniz, 496 U.S. 582, 594 (1990) (citation omitted). We first considered whether a field sobriety test was testimonial in Wyatt, wherein the defendant was asked to perform a three-component battery of tests similar – though not identical – to the SFST at issue in this case.[11] We explained that "the privilege against self-incrimination is not necessarily implicated whenever a person suspected of criminal activity is compelled in some way to cooperate in developing evidence which may be used against him." Wyatt, 67 Haw. at 302, 687 P.2d at 551. We relied on Schmerber v. California, 384 U.S. 757, 763-64 (1966), in which the United States Supreme Court held that a blood draw was nontestimonial because it was "real or physical

---

[11]   Specifically, the defendant participated in the following:

> (a) The arch back test which requires the driver to stand with her back arched and her eyes closed; (b) the heel walk test where the officer requests the driver to take six steps down, turn to the right, and take seven steps back. Each step requires contact between the heel of one foot and the toe of the other foot; and (c) the leg lift test where the driver places her hands behind her head, interlocking her fingers, lifts one leg fifteen inches off the ground and holds it straight ahead of her for fifteen seconds.

Wyatt, 67 Haw. at 301 n.8, 687 P.2d at 550 n.8.

Components (b) and (c) of the above appear virtually identical to the walk-and-turn and one-leg-stand tests respectively. Only component (a) differs from the SFST at issue in this case; Manion was given the HGN test instead of the arch back test. Manion argues that this difference warrants revisiting Wyatt and its progeny. However, he fails to explain why this difference would be meaningful. In any event, the test at issue in Uchima was identical to the one given in the instant case. 147 Hawai'i at 70, 464 P.3d at 858. Uchima, therefore, belies Manion's argument that we should revisit these cases because the SFST has changed.

evidence," to hold that the field sobriety test merely sought "an exhibition of 'physical characteristics of coordination,'" and the defendant's participation in the test therefore did not violate the privilege against self-incrimination.  Wyatt, 67 Haw. at 302-03, 687 P.2d at 551 (quoting State v. Arsenault, 336 A.2d 244, 247 (1975)).

We reaffirmed this holding in Uchima:

> [The defendant's] performance on the [S]FST does not constitute incriminating statements. . . .  In Wyatt, this court held that when conducting an [S]FST the State does not seek "communications" or "testimony," but rather, "an exhibition of 'physical characteristics of coordination.'" . . .  Here, [the officer administering the SFST] did not seek "communications" or "testimony" from [the defendant]. Rather, in conducting the [S]FST, the officer sought "an exhibition of 'physical characteristics of coordination.'" "Consequently, the field sobriety test was not rendered infirm by the constitutionally guaranteed privilege against compulsory self-incrimination."

Uchima, 147 Hawai'i at 84-85, 464 P.3d at 872-73 (citations omitted).

Uchima was correctly decided, and Manion offers no compelling reason to revisit it.  Manion argues that SFST performance is "communication" or "testimony" because it "tests mental capability instead of just purely physical coordination." But this is not what it means to be "testimonial."  Purely physical evidence can provide incriminating information about a person's mental faculties yet nonetheless be nontestimonial. Muniz, 496 U.S. at 593 ("[T]hat the 'fact' to be inferred might be said to concern the physical status of [the defendant's]

brain merely describes the way in which the inference is incriminating.  The correct question for . . . purposes [of determining whether there has been a <u>Miranda</u> violation] is whether the incriminating inference of mental confusion is drawn from a testimonial act or from physical evidence.").

Slurred speech is an apt example.  In <u>Pennsylvania v. Muniz</u>, the United States Supreme Court considered whether asking a suspect accused of driving while intoxicated the date of his sixth birthday was testimonial.  496 U.S. at 590-93.  The Court distinguished between the content of the answer – which revealed that the defendant was unable to remember the date of his sixth birthday – and the way in which the answer was given.  <u>Id.</u>  The former was testimonial because it "convey[ed] information or assert[ed] facts."[12]  <u>Id.</u> at 597 (quoting <u>Doe v. United States</u>, 487 U.S. 201, 213 (1988)).  But the act of slurring the response was not:

> We agree with the [prosecution's] contention that [the defendant's] answers are not rendered inadmissible by <u>Miranda</u> merely because the slurred nature of his speech was incriminating.  The physical inability to articulate words in a clear manner due to "the lack of muscular coordination of his tongue and mouth," . . . is not itself a testimonial component of [the defendant's] responses . . . .

---

[12]    <u>Muniz</u> recognized that "'[t]he vast majority of verbal statements thus will be testimonial' because '[t]here are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts.'"  496 U.S. at 597 (brackets in original) (quoting <u>Doe</u>, 487 U.S. at 213).

> [A]ny slurring of speech and other evidence of lack of muscular coordination revealed by [the defendant's] responses to [the officer's] direct questions constitute nontestimonial components of those responses. Requiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, . . . does not, without more, compel him to provide a "testimonial" response for purposes of the privilege.

Muniz, 496 U.S. at 590–92 (citations omitted).

The SFST, like the slurring of words, is nontestimonial in that it constitutes "an exhibition of physical characteristics of coordination." Uchima, 147 Hawai‘i at 84, 464 P.3d at 872 (quotation marks and citation omitted). We therefore see no reason to revisit our recent holding in Uchima, with which we continue to agree.

## V. CONCLUSION

For the foregoing reasons, the ICA's December 16, 2020 judgment on appeal is affirmed.

Brian R. Vincent
for respondent

Alen M. Kaneshiro
for petitioner

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

