OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

|  |  |  |
|---|---|---|
| OPINION | : | No. 88-1102 |
| of | : | |
| | : | |
| JOHN K. VAN DE KAMP | : | OCTOBER 26, 1989 |
| Attorney General | : | |
| | : | |
| JACK R. WINKLER | : | |
| Assistant Attorney General | : | |
| | : | |

---

THE HONORABLE MAURICE J. HANNIGAN, COMMISSIONER, DEPARTMENT OF THE CALIFORNIA HIGHWAY PATROL, has requested an opinion on the following question:

May a California peace officer lawfully use a preliminary breath testing device to enforce laws prohibiting drunk driving?

CONCLUSIONS

A California peace officer may not lawfully use breath testing devices which determine the concentration of ethyl alcohol in the subject's blood prior to the subject's arrest unless the equipment and procedures used comply with the regulations of the State Department of Health Services. A California peace officer may lawfully use a breath testing device which determines the existence but not the concentration of ethyl alcohol in a person's blood in making preliminary determinations of sobriety prior to an arrest in the enforcement of drunk driving laws.

Asking a driver stopped on reasonable suspicion that he has violated drunk driving laws to take a preliminary breath test ("PBT") and the administration of such a test would meet federal and state constitutional requirements. Use of a passive PBT with minimal intrusion on the driver's time and liberty may be constitutionally employed in the screening process of a sobriety checkpoint and an active or passive PBT may be used as a field sobriety test for drivers found to have symptoms of impairment during the screening process of a sobriety checkpoint.

ANALYSIS

Development and Use of Breath Testing Devices

Devices developed to test a person's breath for alcohol are not new. The Harger Drunkometer was first developed in 1931 and the scientific bases for its operation was described and its reliability and accuracy were approved in *People* v. *Kovacik* (1954) 128 N.Y.S.2d 492. Other breath testing devices, including the "Intoxilyzer", "Intoximeter", "Sober-Meter" and "Breathalyzer" have been used in California. (See e.g., *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262.)

The November 16, 1988 Conforming Products List of Evidential Breath Testing Devices of the National Highway Traffic Safety Administration lists 56 approved devices (50 of them mobile) which test a person's breath for alcohol.

The request for this opinion indicates that the Department is seeking innovative approaches in combating the problem of intoxicated drivers. The use of Preliminary Breath Testing (PBT) devices is being explored. The request is not limited to any specific breath testing device. As the name implies a PBT device tests a sample of a person's breath for alcohol as a means of determining whether he or she is under the influence of an alcoholic beverage. We understand the word "preliminary" to indicate that the device is used before the driver is arrested to assist the officer in determining whether to arrest the driver. It is to be distinguished from the chemical testing of a driver's blood, breath or urine contemplated by the implied consent law (Veh. Code, § 23157) which is administered <u>after</u> the driver is arrested, sometimes referred to as "evidentiary" testing.

Whether a particular device is a PBT device depends more on the method and purpose of its use than upon the nature of the device itself. Conceivably, any breath testing device could be used as a PBT if the necessary equipment and personnel to operate it are made available to the peace officer before an arrest is made. Practical constraints make the more portable and automatic devices more adaptable for use as PBT devices.

Three basic methods are used to obtain the breath samples which are used for alcohol testing. In some the person blows into a balloon which is then attached to the breath testing device to measure its alcohol content. In others the person exhales into a tube which is directly attached to the measuring device. The third method takes a sample of the breath of the person after it has been exhaled and to some extent mixed with the surrounding air from a point in front of the mouth and nose of the person.

The several PBT devices available today are further classified as being either active or passive in operation. From the materials provided with the opinion request we understand an active PBT device to be one which requires the active cooperation and participation of the person being tested to perform the test, such as by blowing through a tube for a sustained period or by blowing up a balloon. A passive PBT device differs from an active device in that it does not require the cooperation of the person being tested other than normally exhaling in the general direction of the device.[1] We understand that some passive PBT devices simply indicate the presence or absence

---

[1]A passive PBT device was given a field test in a sobriety checkpoint conducted in Charlottesville, Virginia. A report of that field test entitled "Detection of Alcohol-Impaired Drivers Using a Passive Alcohol Sensor" dated May, 1985 was made by Ian S. Jones and Adrian K. Lund. Appendix 1 of that report describes the device as follows:

"The Breath Alcohol Passive Sensor is a noninvasive device for detecting alcohol in a motorist's breath. It analyses the air expelled from the lungs when held a few inches away from the subject and indicates the alcohol level on a digital display.

"The instrument is based on the well-established Lion Alcolmeter electronic screening instruments and incorporates an electrochemical fuel cell sensor together with a pump that draws the expelled breath over the sensor. The sensor and pump have been ingeniously incorporated into the instrument's flashlight design, which allows a police officer to carry out night-time checks quickly and easily, without causing inconvenience or embarrassment to sober motorists. While shining the torch

of alcohol in the breath sample without any indication of its concentration. Other passive PBT devices give an indication whether the concentration of alcohol in the breath sample is above or below a certain level. Still others give a numerical readout of the concentration of alcohol in the breath sample.

inside the vehicle, the alcohol content in the expired breath is analyzed and the result displayed in seconds. . . ."

Other passive devices are similar in operation. These include the PBA 200 and the Lion Alcolmeter VAS, both without the flashlight feature, and the Passive Alcohol Sensor, with the flashlight sensor.

California Statutes and Administrative Regulations

The "implied consent law" (now Veh. Code, § 23157)[2] was enacted in 1966. (Ch. 138, Stats. 1966, 1st Ext. Session, adding § 13353 to the Veh. Code.) That law provides that once a peace officer arrests a driver for drunk driving, the driver shall be deemed to have consented to a chemical test of his or her blood, breath or urine for the purpose of determining the alcoholic content of his or her blood. This test is administered after the lawful arrest of the driver for violation of Vehicle Code section 23152 or 23153. The arrested driver is given the choice whether the test will be of blood, breath or urine. The driver's failure to take or complete the test results in an automatic suspension of his or her driving privilege. The purpose of the implied consent law "is to obtain the best evidence of blood alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated." (*Kesler* v. *Dept. of Motor Vehicles* (1969) 1 Cal.3d 74, 77.)

---

[2]The relevant portions of Vehicle Code section 23157 provide:

"(a)(1) Any person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood, breath, or urine for the purpose of determining the alcoholic content of his or her blood, . . . [re testing blood or urine for drugs], if lawfully arrested for any offense allegedly committed in violation of Section 23152 or 23153. The testing shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe the person was driving a motor vehicle in violation of Section 23152 or 23153. The person shall be told that his or her failure to submit to, or the failure to complete, the required chemical testing will result in a fine and (A) . . . [mandatory imprisonment on conviction], (B) the suspension of the person's privilege to operate a motor vehicle for a period of six months, . . .

"(2)(A) If the person is lawfully arrested for driving under the influence of an alcoholic beverage, the person has the choice of whether the test shall be of his or her blood, breath, or urine, and the officer shall advise the person that he or she has that choice. If the person arrested either is incapable, or states that he or she is incapable, of completing any chosen test, the person shall submit to the person's choice of the remaining tests or test, and the officer shall advise the person that the person has that choice.
". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(4) The officer shall also advise the person that he or she does not have the right to have an attorney present before stating whether he or she will submit to a test or tests, before deciding which test or tests to take, or during administration of the test or tests chosen, and that, in the event of refusal to submit to a test or tests, the refusal may be used against him or her in a court of law.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) A person lawfully arrested for any offense allegedly committed while the person was driving a motor vehicle in violation of Section 23152 or 23153 may request the arresting officer to have a chemical test made of the arrested person's blood, breath, or urine for the purpose of determining the alcoholic content of that persons's blood, and, if so requested, the arresting officer shall have the test performed."

Since the implied consent law is expressly limited to tests made after the driver's arrest that law does not limit or affect the tests which may be made before such an arrest. Breath tests for alcohol content were admissible by decisional law before the implied consent law was enacted in 1966. The courts have uniformly held that the enactment of the implied consent law does not affect the admissibility of tests under earlier established case law. (*People* v. *Adams* (1976) 59 Cal.App.3d 559, 562.)

Health and Safety Code section 436.52, first enacted in 1969 (ch. 1421, Stats. 1969), now provides:

"The testing of breath samples by or for law enforcement agencies for purposes of determining the concentration of ethyl alcohol in the blood of persons involved in traffic accidents or in traffic violations shall be performed in accordance with regulations adopted by the State Department of Health Services.

"The rules and regulations shall establish the procedures to be used by law enforcement agencies in administering breath tests for the purpose of determining the concentration of ethyl alcohol in a person's blood. The rules and regulations shall be adopted and published in accordance with Chapter 3.5 (commencing with Section 11340) of Part l of Division 3 of Title 2 of the Government Code."

The regulations adopted pursuant to this statute are set forth in title 17, section 1215 et seq. in the California Code of Regulations. Those relevant to this opinion are set forth in the Appendix. These are referred to as "Regulation" followed by the section number in the Code of Regulations.

The regulations prescribe the standards which instruments for breath alcohol analysis must meet. Regulation 1221.2 adopts by reference the Model Specifications for Evidential Breath Testing Devices of the National Highway Traffic Safety Administration of the United States Department of Transportation as published in the Federal Register, volume 49, No. 242, December 14, 1984. Regulation 1221.2(b) provides that the ability of instruments to conform to the standards shall be tested by the U.S. Department of Transportation. Regulation 1221.3 then provides that only those instruments named in the Conforming Products List published in the Federal Register "shall be used for breath alcohol analysis in this State."[3] Regulations 1219.3, 1221.1 and 1221.4 establish the procedures which must be followed in administering breath tests for the purposes of determining the concentration of ethyl alcohol in a person's blood.

The Model Specifications for Evidential Breath Testing Devices published December 14, 1984 in the Federal Register, volume 49, No. 242 have not been changed. These Model Specifications were adopted as the standard in California by section 1221.2 of title 17 in the

---

[3]We perceive no unconstitutional delegation of legislative power in these regulations. In Health and Safety Code section 436.52 the Legislature determined the fundamental issue of the need for regulation of the equipment and procedures to be used for breath tests to determine the concentration of alcohol in the blood by law enforcement in California. It could properly delegate to the Department of Health Services the determination of the equipment and procedures to be used to implement the Legislature's policy expressed in section 436.52. The department could adopt an existing standard for the equipment to be used by reference which it did by reference to model specifications in the Federal Register. (See *Kugler* v. *Yocum* (1968) 69 Cal.2d 371; 63 Ops.Cal.Atty.Gen. 566, 571.)

California Code of Regulations. The Conforming Product List published as an appendix to the 1984 federal regulation has been changed from time to time since 1984.

The first paragraph of Health and Safety Code Section 436.52 requires the testing of breath samples by law enforcement agencies for the purpose of determining the concentration of ethyl alcohol in the blood of persons involved in traffic violations to be performed in accordance with the regulations of the Department of Health Services. The statute states that such testing "shall be performed" in accordance with the regulations. The word "shall" is to be construed as mandatory. (See Health & Saf. Code, §§ 5 & 16; *People* v. *Adams*, *supra*, 59 Cal.App.3d at 562.) The plain wording of Health and Safety Code section 436.52 requires such breath testing by law enforcement agencies to conform to the regulations. The only exception to the equipment and procedure requirements of the regulations for law enforcement use of breath tests are tests which do not determine the concentration of ethyl alcohol in the blood. A PBT device which only indicates the presence of ethyl alcohol without giving any indication of the concentration of alcohol in the sample would not be subject to the statute or regulations. However, if a PBT device does give an indication of the concentration of alcohol in the blood by numerical readout, lights or otherwise, its use by law enforcement must, in so far as the reading for concentration is concerned, conform to the regulations.

It has been suggested that the use of breath testing devices before an arrest is made would not be subject to the regulations required by Health and Safety Code section 436.52. The suggestion is that section 436.52 was enacted to govern the chemical testing of drivers contemplated by the implied consent law after the driver's arrest. However, nothing in the wording of section 436.52 suggests that it is limited to post arrest testing. In 1971 Assemblyman John Stull, the author of AB 789 which was enacted in 1969 adding section 436.52 to the Health and Safety Code requested an opinion from the Legislative Counsel asking whether the new law required licensing of peace officers who conducted breath tests in the field. In Opinion No. 5746 dated May 6, 1971 the Legislative Counsel replied that such licensing was not required relying upon the administrative interpretation given the licensing requirement by the Department of Public Health. The Legislative Counsel's opinion stated as follows:

> "It should be pointed out, however, that Section 436.52, which is part of Chapter 5, requires the board to adopt rules and regulations establishing the procedures to be used by law enforcement agencies in administering breath tests for the purposes of determining the concentration of ethyl alcohol in a person's blood. Such rules and regulations, which are contained in Article 7 (commencing with Section 1221) of Group 8 of Chapter 2 of Title 17 of the California Administrative Code, set forth the standards of procedures for breath alcohol analysis, but do not require the licensing of peace officers who conduct breath test <u>in the field</u>." (Emphasis added.)

This opinion indicates that the regulations have been interpreted since their inception to apply to breath testing procedures used by peace officers in the field. Nothing in that opinion suggests that the regulations would be limited to post arrest field tests.
Accordingly we reject the suggestion that the regulations required by Health and Safety Code section 436.52 are applicable only to tests conducted after the arrest of the subject.

It is apparent that the regulations were designed to regulate the gathering of evidence of the concentration of alcohol in the defendant's blood for use at his or her trial on drunk driving charges and did not contemplate the use of breath testing for such preliminary purposes as providing a peace officer with probable cause to believe a driver was under the influence of an alcoholic beverage which would justify the driver's arrest for drunk driving. The requirement in Regulation

1219.3 that "the subject has been under continuous observation for at least fifteen minutes prior to collection of the breath sample" would make breath testing impractical for most preliminary purposes.

The authority granted to the State Department of Health Services by section 436.52 is broad enough to provide for preliminary breath testing should the department decide to amend its regulations. The regulations could authorize the use of different equipment and procedures on breath testing for preliminary purposes.[4] But unless and until such regulations are adopted, Health and Safety Code section 436.52 prohibits the use of breath tests by law enforcement to determine concentration of alcohol in the blood which does not use the equipment and procedures required by the regulations.

We conclude that California law enforcement officers may use a breath testing device for the purpose of determining the existence but not the concentration of ethyl alcohol in a person's blood in making preliminary determinations of sobriety prior to an arrest in the enforcement of drunk driving laws. However, they may not lawfully use breath testing devices for the purpose of determining the concentration of ethyl alcohol in the blood using equipment or procedures which do not comply with the regulations of the State Department of Health Services in making such preliminary determinations.

<u>Constitutionality of Use of Breath Testing Devices</u>

While we have concluded that law enforcement use of PBT devices in California is limited by statute and regulations California courts have held that the evidence produced by breath tests which do not comply with those statutes and regulations is not excluded on that account but may be admitted in evidence if the tests meets other statutory and constitutional requirements. (*People* v. *Adams*, *supra*, 59 Cal.App.3d 559.) Furthermore, those statutes and regulations may be amended. However, the use of PBT devices by California peace officers in the enforcement of drunk driving laws is subject to the search and seizure requirements of the Fourth Amendment of the United States Constitution and of article I, section 13 of the California Constitution. We therefore consider how these constitutional requirements will affect the use of PBT devices in enforcing drunk driving laws in common traffic law enforcement situations.

Since the question is concerned with the enforcement of laws against drunk driving we must consider the methods used by California peace officers to enforce those laws. There are two basic law enforcement methods in current use which must be distinguished. These may be called the investigative stop and the sobriety checkpoint. The question further limits our concern to the use of breath testing devices before an arrest is made. We therefore do not address the use of such devices after an arrest is made or pursuant to the implied consent law.

---

[4]Several states have enacted statutes which expressly authorize the use of breath tests for preliminary purposes under prescribed circumstances. A number of these statutes limit the uses which may be made of these preliminary tests, such as to assist the officer in determining whether there is probable cause for arrest. Some also prohibit the use of such preliminary test results in court. A summary of these statutes is set forth in a paper entitled The Legal Aspects of the Use of Passive Alcohol Screening Devices as Law Enforcement Tools for DWI Enforcement by James P. Manak, BA, JD, LLM, Senior Counsel of The Traffic Institute, Northwestern University, Evanston, Illinois dated December, 1984.

## Investigative Stops

The traditional method of enforcing drunk driving laws is the observation by a peace officer on patrol of conduct by a motorist indicative of driving under the influence and stopping the vehicle for investigation of that offense. It is settled that circumstances short of probable cause to make an arrest may justify a peace officer stopping and briefly detaining a person for questioning or other limited investigation. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450; *In re Tony C.* (1978) 21 Cal.3d 888, 892.) Such a stop constitutes an invasion of a person's personal security protected by the Fourth Amendment and by article I, section 13 of the California Constitution. The guiding principle which governs the constitutionality of the investigative stop under the search and seizure provisions of both constitutions is the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 19; *In re Tony C.*, *supra*.)

The test of the reasonableness of an investigative stop was spelled out by the California Supreme Court in *In re Tony C.*, *supra*, 21 Cal.3d at 893 as follows. In order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing the officer to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person the officer intends to stop or detain is involved in that activity. Not only must the officer subjectively entertain such a suspicion, but it must be objectively reasonable for the officer to do so: the facts must be such as would cause any reasonable peace officer in a like position, drawing when appropriate on his training and experience, to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule is than an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unconstitutional, even though the officer may be acting in complete good faith.[5]

## Drunk Driving Stops

Our task is to apply the *In re Tony C.* test of reasonableness to the use of PBT devices in an investigation conducted by a California peace officer who has stopped a vehicle to investigate

---

[5]The court amplified its reasonable suspicion test for an investigative stop in *In re Tony C.*, *supra*, at 894 as follows:

> "... [A] reasonable suspicion of involvement in criminal activity will justify a temporary stop or detention. Under that standard, if the circumstances are `consistent with criminal activity,' they permit - even demand - an investigation: the public rightfully expects a police officer to inquire into such circumstances `in the proper discharge of the officer's duties.' [citation] No reason appears for a contrary result simply because the circumstances are also `consistent with lawful activity,' as may often be the case. The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal - to `enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' [citation] The citizen's undoubted interest in freedom from abuse of this procedure is protected - so far as it is within the law's power to do so - by the correlative rule that no stop or detention is permissible when the circumstances are not reasonably `consistent with criminal activity' and the investigation is therefor based on mere curiosity, rumor, or hunch."

a criminal violation. As that test indicates the circumstances known or apparent to the officer must include specific and articulable facts causing the officer to suspect that some activity relating to crime has occurred and that the person stopped is involved in that activity to make the stop reasonable. Those facts could include information which gives the officer a reasonable suspicion that the driver of a vehicle is violating the drunk driving laws which would justify stopping the vehicle under the *In re Tony C.* test. The following facts have been held to provide the officer with a reasonable suspicion that the driver had been drinking which justified stopping the vehicle for investigation of drunk driving:

(a) Observing the driver staggering before he got into the vehicle. (*People* v. *Beal* (1974) 44 Cal.App.3d 216; *People* v. *Zafiropoulos* (1983) 145 Cal.App.3d Supp. 35.)

(b) Observing vehicle weaving from one lane to another. (*People* v. *Tennessee* (1970) 4 Cal.App.3d 788.)

(c) Observing vehicle weaving back and forth in the same lane. (*People* v. *Perez* (1985) 175 Cal.App.3d Supp. 8. 11.)

Once the officer stops a vehicle on a reasonable suspicion that the driver had been drinking the officer may then make a reasonable investigation to determine if the driver had violated the drunk driving laws. This would include asking the driver to submit to field sobriety tests and conducting such tests. (*People* v. *Superior Court (Meyer)* (1981) 118 Cal.App.3d 579, 585; *People* v. *Bennett* (1983) 139 Cal.App.3d 767.)[6]

In our view a PBT is simply another form of field sobriety testing. Asking the driver to blow into the PBT would appear to be no more intrusive than to ask him or her to walk a straight line or perform other physical and verbal coordination tests. A PBT would also provide a more reliable method of determining the existence of alcohol in the driver's blood. As the supreme court observed in *People* v. *Sudduth* (1966) 65 Cal.2d 543, 546:

"We note that the physical and psychological disturbance of the individual involved in obtaining a breath sample is apt to be significantly less than that involved in extracting a blood sample, an evidence-gathering technique recently approved in *Schmerber* v. *California* (1966) 384 U.S. 757, . . . The value of such objective scientific data of intoxication to supplement the fallible observation by humans of behavior seemingly symptomatic of intoxication cannot be disputed. (*People* v. *Duroncelay* (1957) 48 Cal.2d 766, 772.) In a day when excessive loss of life and property is caused by inebriated drivers, an imperative need exists for a fair, efficient, and accurate system of detection, enforcement and, hence, prevention."

The courts of other states have considered the constitutional validity of the use of PBT devices in drunk driving cases. In *State* v. *Anderson, supra*, 359 N.W.2d 887 the South Dakota Supreme Court held that a preliminary breath test of a driver stopped on reasonable suspicion of drunk driving short of probable cause to arrest was constitutional.

---

[6]The courts in other states have approved field sobriety tests of a driver stopped on a reasonable suspicion of violating drunk driving laws. (*State* v. *Anderson* (S.D. 1984) 359 N.W.2d 887; *State* v. *Purdie* (Mont. 1984) 680 P.2d 576; *State* v. *Wyatt* (Hawaii 1984) 687 P.2d 544; *State* v. *Little* (Me. 1983) 468 A.2d 615.) Cf. *People* v. *Carlson* (Colo. 1984) 677 P.2d 310 holding that short of probable cause the defendant was driving while intoxicated, he may not be subjected to a roadside sobriety test.

We conclude that California courts would hold that asking a driver stopped on reasonable suspicion that he has violated drunk driving laws to take a PBT and the administration of such a test would be held to be reasonable under the search and seizure requirements of the state and federal constitutions.

Stops for Other Offenses

When a motorist is stopped on a reasonable suspicion that he or she has committed an offense other than drunk driving the officer may make a reasonable investigation of that offense. However, an investigatory detention exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances which made its initiation permissible. (*People* v. *McGaughran* (1979) 25 Cal.3d 577, 586.) Since the circumstance which made the stop permissible was a reasonable suspicion that the driver had committed some offense other than drunk driving, the grounds for the stop would not justify an investigation of drunk driving. However, once a vehicle has been legitimately stopped for an infraction, the officer may stop the vehicle and detain it and its occupants for such period of time as is necessary to issue a citation, to determine whether the driver has a valid driver's license and to investigate the vehicle registration. (*People* v. *McGaughran*, *supra*, 25 Cal.3d at 584; Veh. Code, §§ 4462(a) & 12951(b).)[7]  Should the officer learn new facts during the course of this investigation which gives him a reasonable suspicion the driver had been drinking (such as smelling an alcoholic beverage on the breath of the driver) this independent reasonable suspicion (see *Williams* v. *Superior Court* (1985) 168 Cal.App.3d 349, 358) would justify extending the detention for a reasonable investigation for drunk driving, including roadside sobriety tests.

Refusal of Testing

In *People* v. *Sudduth*, *supra*, 65 Cal.2d 543 the defendant was arrested for drunk driving and refused to perform field sobriety tests or take a breathalyzer test. The court held that the defendant's refusal to take the tests and the prosecutor's comment thereon to the jury were constitutionally admissable citing the reasoning in *People* v. *Ellis* (1966) 65 Cal.2d 529 decided the same day.  In the *Ellis* case a rape victim identified the defendant as her assailant at a lineup and indicated she could also identify the assailant's voice.  The defendant refused to speak for purposes of voice identification.  The court said that while it was impermissible to penalize an individual for exercising his constitutional right against self incrimination by allowing comment on his failure to testify such a rule is not applicable when, as in that case, the defendant has no constitutional right to refuse to speak solely for purposes of voice identification.  The *Ellis* court added (at pp. 536-537) that the defendant's refusal to "display his voice" was not itself a testimonial communication protected by the Fifth Amendment but it was "circumstantial evidence of consciousness of guilt, and like similar evidence, such as escape from custody [citation], false alibi [citation], flight [citation], suppression of evidence [citation], and failure to respond to accusatory statements when not in police custody [citation], its admission does not violate the privilege."

The *Ellis* court made these observations concerning the evidentiary use of a refusal to take a test:  "A guilty party may prefer not to find himself in a situation where consciousness of

---

[7]The court in *McGaughran* added that "although not specifically compelled by law, certain other steps customarily taken as matters of good police practice are no less intimately related to the citation process: for example, the officer will usually discuss the violation with the motorist and listen to any explanation the latter may wish to offer; and if the vehicles of either are exposed to danger, the officer may require the driver to proceed to a safer location before the investigation continues."

guilt may be inferred from his conduct, but it can scarcely be contended that the police, who seek evidence from the test itself, will tend to coerce parties into refusing to take tests in order to produce this evidence. [¶] Although conduct indicating consciousness of guilt is often described as an `admission by conduct,' such nomenclature should not obscure the fact that guilty conduct is not a testimonial statement of guilt. It is therefore not protected by the Fifth Amendment. By acting like a guilty person, a man does not testify to his guilt but merely exposes himself to the drawing of inferences from circumstantial evidence of his state of mind."

If the driver who is lawfully stopped in an investigative stop by an officer who has a reasonable suspicion the driver has been drinking refuses the officer's request to perform roadside sobriety tests the officer may infer from that refusal that the driver thinks he would fail such test and this inference of consciousness of guilt on the part of the driver is circumstantial evidence that the driver had consumed enough alcohol that he or she would fail the tests. We think this evidence when added to the officer's reasonable suspicion that the driver had been drinking, in the absence of exculpatory circumstances, may well provide the officer with probable cause to believe the driver was under the influence of alcohol which would justify the driver's arrest for drunk driving.

Other Constitutional Provisions

The above analysis has focused on the reasonableness of subjecting a driver to PBTs for screening and field sobriety tests under the Fourth Amendment. Objections to field sobriety tests have also been made on other constitutional grounds. Failure to give a *Miranda* warning before asking a motorist stopped on a reasonable belief he or she had violated drunk driving laws to submit to a balancing test did not violate the Fifth Amendment right against self incrimination. (*Berkemer* v. *McCarty* (1984) 468 U.S. 420.) In *Whalen* v. *Municipal Court* (1969) 274 Cal.App.2d 809 the court held that subjecting a driver to a field sobriety test (without the presence of counsel) did not violate the Fifth Amendment privilege against self incrimination or the Sixth Amendment right to counsel. Failure to collect and retain breath samples for independent testing does not violate the due process clause of the Fourteenth Amendment. (*California* v. *Trombetta* (1983) 467 U.S. 479.) *People* v. *Mills* (1985) 164 Cal.App.3d 652 held that there is no constitutional requirement that a person arrested for drunk driving be notified that a breath sample would not be preserved for independent testing if the person chose a breath test as the method of testing under Vehicle Code section 23157.

Persons reasonably suspected of driving while under the influence of alcohol have no constitutional right to refuse a test designed to produce physical evidence in the form of a breath sample provided the taking of the sample is not done in a manner which shocks the conscience or offends one's sense of justice. (*People* v. *Sarkissian* (1978) 81 Cal.App.3d 660, 663; *People* v. *Sudduth*, *supra*, 65 Cal.2d at 546; *Rochin* v. *California* (1952) 342 U.S. 165.) Thus there is no requirement that the suspect be advised of such a right. However, advising the suspect that he or she has no right to refuse such testing will strengthen the inference of consciousness of guilt arising from a refusal to perform the test by eliminating the suspects claim that he or she thought there was a right to refuse such testing.

Sobriety Checkpoints

The sobriety checkpoint is a more recent method of enforcement of the laws against drunk driving approved in *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321. In *Ingersoll* the court held

that sobriety checkpoints conducted with prescribed safeguards[8] complied with the Fourth Amendment though it involved the stopping of motorists without any individualized suspicion of wrongdoing. At p. 1327 of the *Ingersoll* opinion the court described the sobriety checkpoint operation as follows:

> "On the night of the checkpoint operation, every fifth car was stopped and directed to a screening officer. The screening officer gave the driver a brief prescribed oral explanation of the checkpoint, and handed him or her an information flyer and a postage paid opinion survey card. During the contact, the screening officer observed the driver for bloodshot eyes, alcohol on the breath, and any other signs of impairment. The officer also shined a flashlight into the vehicle, looking for any open containers or other evidence of alcohol consumption. If no symptoms of impairment were observed, the driver was directed to continue into the northbound traffic lanes. If signs of impairment were observed, the driver was directed to a secondary testing area, where another officer would administer a field sobriety test. . . ."

The *Ingersoll* court stated that the individualized suspicion test of *In re Tony C.* was not applicable because the primary purpose of sobriety checkpoints was not to discover or preserve evidence of

---

[8]The *Ingersoll* court listed the following safeguards necessary to establish the reasonableness of sobriety checkpoints under the Fourth Amendment:

A. The decision to establish a sobriety checkpoint, the selection of the site and procedures for the checkpoint operation must be established by supervisory law enforcement personnel and not by an officer in the field.

B. A neutral formula must be used to determine which vehicles are to be stopped, such as every third, fifth or tenth driver so that who is stopped is not left to the unbridled discretion of the officer in the field.

C. Primary consideration must be given to maintaining safety for motorists and officers with proper lighting, warning signs and clearly identifiable official vehicles and personnel.

D. The location of a checkpoint should be determined by policy-making officials rather than by officers in the field with sites chosen which have a high incidence of alcohol related accidents and/or arrests consistent with safety considerations.

E. The time of day and the duration of checkpoints must be carefully considered with effectiveness, safety and motorists concerns kept in mind.

F. The checkpoint must be established with high visibility displaying its official nature by sign, lights and uniformed officers to reassure motorists the stop is duly authorized.

G. Each motorist stopped should be detained only long enough for the officer to question the driver briefly and to look for signs of intoxication, such as alcohol on the breath, slurred speech, and glassy or bloodshot eyes. If the driver does not display signs of impairment, he or she should be permitted to drive on without further delay.

H. Advance publicity must be given a sobriety checkpoint to reduce its intrusiveness and increase its deterrent effect.

crime or arrest lawbreakers, but was "primarily for the regulatory purpose of keeping intoxicated drivers off the highways to the end of enhancing public safety." (*Ingersoll* v. *Palmer*, *supra*, at p. 1335)

As the court observed in *Ingersoll* (as quoted above) when the screening officer at a sobriety checkpoint observes symptoms of impairment the driver is directed to a secondary testing area, where another officer administers a field sobriety test. We have already indicated our view that a PBT may be utilized as a field sobriety test. We believe that a PBT, using appropriate equipment and procedures, as "a" method of field sobriety testing at sobriety checkpoints would comply with constitutional requirements as set forth in *Ingersoll*.

If a PBT device were employed in the screening process of a sobriety checkpoint the standards enumerated in the *Ingersoll* case (See footnote 8) would have to be met for its use to comply with constitutional search and seizure guarantees. As the *Ingersoll* court discusses at p. 1338 the reasonableness of a search or seizure is measured by a balancing test, weighing the gravity of the governmental interest or public concern served and the degree to which the program advances that concern against the intrusiveness of the interference with individual liberty. Of the several safeguards which the court considered significant in this weighing process the only one which appears to be affected by the use of a PBT in screening the drivers stopped would be the length and nature of the detention. At p. 1346 the *Ingersoll* court stated:

> "Minimizing the average time each motorist is detained is critical both to reducing the intrusiveness of the stop on the individual driver and to maintaining safety by avoiding traffic tie-ups. As occurred in the Burlingame and CHP checkpoints, each motorist stopped should be detained only long enough for the officer to question the driver briefly and to look for signs of intoxication, such as alcohol on the breath, slurred speech, and glassy or bloodshot eyes. If the driver does not display signs of impairment, he or she should be permitted to drive on without further delay. If the officer does observe symptoms of impairment, the driver may be directed to a separate area for a roadside sobriety test. At that point, further investigation would of course be based on probable cause, and general principles of detention and arrest would apply."

The time the administration of a preliminary breath test would take and intrusion it would make upon a driver's liberty will vary depending upon the PBT device used and the procedures which are followed in its use. Many of the active PBT devices require the subject to blow into a balloon or tube for a sustained period in order to test the breath from the lower part of the lungs. This might well take more time and be more intrusive upon the driver's liberty than is constitutionally permissible under the standards announced in *Ingersoll*. However, we believe the courts would hold that the use of a passive breath testing device used in the manner described in footnote 1 in the screening process of a sobriety checkpoint would comply with the *Ingersoll* standards. We conclude that a passive preliminary breath testing device which is operated with minimal intrusion on the driver's time and liberty may constitutionally be employed to ascertain whether there is a reasonable suspicion the driver has been drinking during the screening process of a sobriety checkpoint. If technology develops to the point where the administration of an active breath test would involve no more time than the brief questioning and observation authorized in *Ingersoll*, and required no more intrusion upon the driver's liberty than answering the questions authorized by *Ingersoll*, active devices to determine the presence of alcohol could also constitutionally be employed.

We conclude that use of a passive PBT with minimal intrusion on the driver's time and liberty may be constitutionally employed in the screening process of a sobriety checkpoint and

that use of an active or passive PBT as a field sobriety test for drivers found to have symptoms of impairment during the screening process of a sobriety checkpoint would be constitutional.

## Evidentiary Value of Preliminary Breath Tests

The forgoing analysis has discussed the legality of using preliminary breath testing by peace officers in the field. The request for this opinion also sought our views on the evidentiary value of preliminary breath testing. Since no precise evidentiary question was submitted we will simply discuss briefly some of the more significant constitutional and statutory evidence questions which might arise in the prosecution of a drunk driving case concerning the use of a preliminary breath test.

The "exclusionary rule" bars use by the prosecution of evidence which was obtained by law enforcement officers in violation of the defendant's constitutional rights. (*People* v. *Cahan* (1955) 44 Cal.2d 434; *Mapp* v. *Ohio* (1961) 367 U.S. 643.)[9] While use of a PBT may violate Health and Safety Code section 436.52 (*supra* at pp. 5-8) we have already concluded that a PBT may be used in stated circumstances without violating constitutional guarantees. We therefore conclude that such PBT tests results would not be inadmissible under the exclusionary rule.

One use of PBT evidence is to establish probable cause for the arrest of the defendant when the validity of the arrest has become an issue in the case. Knowledge of the results of a PBT taken before arrest would be important evidence on the issue of probable cause for the arrest.

Another use of PBT evidence is to establish reasonable suspicion that a driver had been drinking so as to authorize a more extended detention for further investigation. As we have previously discussed an officer's authority to request a driver to submit to a roadside sobriety test depends upon the officer having a reasonable suspicion that the driver has been drinking under the test announced in *In re Tony C., supra*. That suspicion may arise from observations of the defendants driving or other conduct, a smell of alcohol on the defendant's breath, the defendant's bloodshot eyes or slurred speech. It could also arise from a passive PBT conducted by the officer which indicates alcohol in the breath of the driver. Such a passive PBT result would be important evidence on the issue of the officer's reasonable suspicion the driver had been drinking upon which the validity of a roadside sobriety test, including further breath testing, could depend.

The most obvious use of a PBT would be as indirect evidence that the defendant was under the influence of an alcoholic beverage when he or she was driving a vehicle, the principal fact to be proved in any drunk driving prosecution. Evidence of the results of a breath test taken within a short time of such driving showing the presence of alcohol would be relevant evidence of that fact. Evidence Code section 351 provides that "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." Evidence Code section 210 provides: "`Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

---

[9]Article I, section 28(d) of the California Constitution (the "truth in evidence" provision in the so-called Victim's Bill of Rights) has limited the scope of the exclusionary rule generally in California to bar only that relevant evidence whose exclusion is compelled by the United States Constitution.

Issues of reliability will arise in the evidentiary context. The development of passive PBT devices has occurred within the last decade and we are not aware of any California appellate court decisions which have considered the reliability of any passive PBT device or the admissibility of test results utilizing these devices. In *People* v. *Kelly* (1976) 17 Cal.3d 24 the California Supreme Court articulated the general principles of admissibility of evidence based on the application of a new scientific technique. In what has become known as the "Kelly/Frye" rule the court stated that the technique must be "sufficiently established to have gained general acceptance in the particular field to which it belongs." Once the admissability of evidence based on a new scientific technique is affirmed in a final appellate court decision which is published, "appellate endorsement of a technique ends the need for case-by-case adjudication." (*People* v. *Brown* (1985) 40 Cal.3d 512, 530.) Until a new technique has appellate endorsement the reliability of the technique must be proved by the testimony of qualified experts. (*People* v. *Kelly*, *supra*, p. 30.)

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Any ruling on admissibility would be subject to the rather broad discretion of the trial judge to exclude evidence on one of these statutory grounds. A trial judge might consider PBT evidence admissible on the issues of reasonable suspicion to stop and detain or probable cause to arrest but confusing on the issue of the concentration of alcohol in the blood when there is an evidentiary test of blood, breath or urine taken after the arrest which complies with regulations of the Department of Health Services and on that basis refuse to admit it in evidence for consideration by the jury on the issue of guilt.

Of course the use of PBT evidence is not restricted to the prosecution. It is conceivable that evidence of a PBT of the defendant would indicate a lower concentration of alcohol than the evidentiary test taken after the defendant's arrest. In fact the test results from a passive PBT would likely indicate a lower concentration of alcohol that an active PBT because the breath sample will be diluted somewhat by air which did not come from the lungs of the subject. If the test meets the legal requirements for reliability and is not excluded on Evidence Code section 352 grounds it might be offered by the defense to impeach the evidentiary test.[10]

APPENDIX

Regulations relevant to breath alcohol analysis in title 17, section 1215 et seq. of the California Code of Regulations:

"1219. General. Samples taken for forensic alcohol analysis and breath alcohol analysis shall be collected and handled in a manner approved by the Department. The identity and integrity of the samples shall be maintained through collection to analysis and reporting."

---

[10]The use of PBTs is controlled by statute in several states including Florida, Indiana, Maine, Minnesota, Mississippi, Nebraska, New York, North Carolina, North Dakota, South Dakota, Vermont, Virginia and Wisconsin. Some of these statutes provide that PBT evidence is admissible on some issues such as probable cause to arrest, or reasonable suspicion the driver had been drinking, but is not admissible on other issues such as the guilt of the driver. (Report on a National Study of Preliminary Breath Test (PBT) and Illegal per se Laws by Donald Macdonald and Marvin Wagner issued by the U. S. Department of Transportation in August, 1981 [DOT HS-806-048])

"1219.3. Breath Collection. A breath sample shall be expired breath which is essentially alveolar in composition. The quantity of the breath sample shall be established by direct volumetric measurement. The breath sample shall be collected only after the subject has been under continuous observation for at least fifteen minutes prior to collection of the breath sample, during which time the subject must not have ingested alcoholic beverages or other fluids, regurgitated, vomited, eaten, or smoked."

Article 7. Requirements for Breath Alcohol Analysis

"1221. General. Breath alcohol analysis shall be performed in accordance with standards set forth in this Article."

"1221.1. Authorized Procedures.

"(a) Breath alcohol analysis shall be performed only with instruments and related accessories which meet the standards of performance set forth in these regulations.

"(b) Such instruments may be used for the analysis of breath samples in places other than licensed forensic alcohol laboratories and by persons other than forensic alcohol supervisors, forensic alcohol analysts and forensic alcohol analyst trainees only if such places and persons are under the direct jurisdiction of a governmental agency or licensed forensic alcohol laboratory.

"(1) Breath alcohol analysis by persons other than forensic alcohol supervisors, forensic alcohol analysts and forensic alcohol analyst trainees shall be restricted to the immediate analysis of breath samples collected by direct expiration by the subject into the instrument in which the measurement of alcohol concentration is performed.

"(2) Except for the requirements of Section 1220.4 [governing how analytical results are to be expressed], such immediate analysis shall not be subject to the requirements of Article 6 [governing the laboratory methods of forensic alcohol analysis]."

"1221.2. Standard of Performance.

"(a) Instruments for breath alcohol analysis shall meet the following standard:

"(1) The instrument and any related accessories shall be capable of conforming to the `Model Specifications for Evidential Breath Testing Devices' of the National Highway Traffic Safety Administration of the U.S. Department of Transportation, which were published in the Federal Register, Vol. 49, No. 242, Pages 48854-48872, December 14, 1984, and are hereby adopted and incorporated.

"(b) The ability of instruments and any related accessories to conform to the standard of performance set forth in this section shall be tested by the U.S. Department of Transportation."

"1221.3. Approved Instruments.

"(a) Only such types and models of instruments and related accessories as are named in the `Conforming Products List' published in the Federal Register by the National Highway Traffic and Safety Administration of the U.S. Department of Transportation shall be used for breath alcohol analysis in this State."

"1221.4. Standards of Procedure.

"(a) Procedures for breath alcohol analysis shall meet the following standards:

"(1) For each person tested, breath alcohol analysis shall include analysis of 2 separate breath samples which result in determinations of blood alcohol concentrations which do not differ from each other by more than 0.02 grams per 100 milliliters.

"(2) The accuracy of instruments shall be determined.

"(A) Such determination of accuracy shall consist, at a minimum, of periodic analysis of a reference sample of known alcohol concentration within accuracy and precision limits of plus or minus 0.01 grams % of the true value; these limits shall be applied to alcohol concentrations from 0.10 to 0.30 grams %. The reference sample shall be provided by a forensic alcohol laboratory.

"1. Such analysis shall be performed by an operator as defined in Section 1221.4 (a)(5), and the results shall be used by a forensic alcohol laboratory to determine if the instrument continues to meet the accuracy set forth in Section 1221.4 (a)(2)(A).

"(B) For the purposes of such determinations of accuracy, `periodic' means either a period of time not exceeding 10 days or following the testing of every 150 subjects, whichever comes sooner.

"(3) Breath alcohol analysis shall be performed only with instruments for which the operators have received training, such training to include at minimum the following schedule of subjects:

"(A) Theory of operation;

"(B) Detailed procedure of operation;

"(C) Practical experience;

"(D) Precautionary checklist;

"(E) Written and/or practical examination.

"(4) Training in the procedures of breath alcohol analysis shall be under the supervision of persons who qualify as forensic alcohol supervisors, forensic alcohol analysts or forensic alcohol analyst trainees in a licensed forensic alcohol laboratory.

"(A) After approval as set forth in Section 1218, the forensic alcohol laboratory is responsible for the training and qualifying of its instructors.

"(5) An operator shall be a forensic alcohol supervisor, forensic alcohol analyst, forensic alcohol analyst trainee or a person who has completed successfully the training described under Section 1221.4 (a)(3) and who may be called upon to operate a breath testing instrument in the performance of his duties.

"(6) Records shall be kept for each instrument to show the frequency of determination of accuracy and the identity of the person performing the determination of accuracy.

"(A) Records shall be kept for each instrument at a licensed forensic alcohol laboratory showing compliance with this Section."

"1221.5. Expression of Analytical Results.

"Results of breath alcohol analysis shall be expressed as set forth in Section 1220.4." [Section 1220.4 provides that all analytical results shall be expressed in terms of the alcohol concentration in blood, based on the number of grams of alcohol per 100 milliliters of blood.]