John McCORMICK, Appellant,

v.

MUNICIPALITY OF ANCHORAGE,
Appellee.

No. A–6557.

Court of Appeals of Alaska.

March 10, 2000.

Rehearing Denied June 2, 2000.

---

Frederick T. Slone, Kasmar and Slone, Anchorage, for Appellant.

Benjamin O. Walters, Jr., Deputy Municipal Prosecutor, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

*As Modified on Rehearing*

MANNHEIMER, Judge.

John McCormick was involved in a motor vehicle accident. When the police arrived on the scene, an officer asked McCormick to perform field sobriety tests. McCormick agreed to perform a horizontal gaze nystagmus test, and the results from all six segments of the test indicated that McCormick was under the influence of alcohol. The officer next asked McCormick to perform two other tests: the turn-and-walk test, and the stand-on-one-leg test. McCormick refused to perform these tests. The officer then arrested McCormick for driving under the influence.

At McCormick's trial, the Municipality introduced evidence that McCormick had refused to perform the latter two field sobriety tests. In this appeal, McCormick contends that the Municipality should not have been allowed to introduce evidence of, or comment

on, McCormick's refusal to perform these two field sobriety tests.

At the police station, McCormick submitted to a breath test. He then exercised his right to obtain an independent blood test at a local hospital. Hospital personnel drew two vials of McCormick's blood. Soon thereafter, McCormick's attorney contacted the hospital and directed them to send both vials to a laboratory in Colorado. The Municipality was not notified of this action.

Some months later, thinking that the blood sample was still at the hospital, the Municipality obtained a search warrant for the blood sample, contacted the hospital, and discovered that the blood had been sent away at the defense attorney's direction. The Municipality then applied to the district court for an order directing the defense attorney to surrender any unused blood to the Municipality for testing. The district court issued this order. A portion of the blood was sent to the Municipality; when tested, this blood yielded a result of .125 percent alcohol. This test result was introduced at McCormick's trial.

On appeal, McCormick contends that the district court should not have ordered McCormick's attorney to surrender the remaining blood. McCormick argues that the Alaska Constitution bars a court from ordering a DWI defendant to produce a portion of the blood drawn during an independent test; he contends that any such order impermissibly burdens the defendant's due process right to an independent test. McCormick also contends that, because the blood in question was in the possession of his attorney or his attorney's agents (the laboratory in Colorado), the district court's order infringed McCormick's attorney-client privilege.

In addition, McCormick contends that the district court improperly prohibited him from arguing to the jury that they should distrust the government's blood-test results because McCormick's blood sample might have been mishandled or improperly preserved by the Colorado laboratory.

Finally, McCormick challenges one aspect of his sentence: the forfeiture of his vehicle.

For the reasons explained here, we reject all of McCormick's contentions and we affirm his conviction.

*Can the government introduce evidence of, and comment on, a motorist's refusal to perform field sobriety tests after the motorist is validly stopped on suspicion of driving while intoxicated?*

As described above, McCormick refused to perform two of the field sobriety tests requested by the police officer. Before trial, McCormick asked the district court to exclude all evidence of his refusal to perform these two tests and to prohibit the government from commenting on McCormick's refusal. The district court denied this request.

On appeal, McCormick renews his argument that the Municipality should not have been allowed to mention his refusal to perform the two field sobriety tests. McCormick advances three theories as to why this evidence was inadmissible.

■ McCormick first argues that the Alaska Legislature did not intend for the government to be able to use evidence of a motorist's refusal to consent to field sobriety tests. He points out that, in AS 28.35.032(e), the legislature has expressly allowed the government to use evidence of a motorist's refusal to submit to a breath test.[1] McCormick argues that the lack of any similar statute concerning field sobriety tests means that the legislature did not intend for the government to be able to use evidence of a motorist's refusal to perform field sobriety tests.

We do not interpret AS 28.35.032(e) as impliedly limiting the government's ability to introduce evidence of a motorist's refusal to take field sobriety tests. Rather, this statute was enacted in order to make sure that the government could introduce evidence of a motorist's refusal to submit to a breath test.

AS 28.35.032(e) was apparently passed in response to the Alaska Supreme Court's decision in *Puller v. Anchorage*.[2] In *Puller*, the supreme court interpreted a former version of AS 28.35.032 that did not expressly state that a motorist's refusal to take a breath test could be used as evidence against them. The court held that, in the absence of an express provision allowing the government to use evidence of a motorist's refusal, the court would presume that the legislature intended to bar the government from using this evidence.[3] Two years later, the legislature enacted AS 28.35.032(e).[4]

Both *Puller* and AS 28.35.032(e) are based on the premise that a motorist's refusal to submit to the statutorily mandated breath test is a peculiar kind of evidence that should be treated differently for policy reasons. The government exerts unusual coercion on motorists to submit to the breath test, so unusual procedural safeguards should be satisfied before the government is allowed to use evidence of a motorist's refusal to take the test. But this policy is itself atypical. Ordinarily, the government does not need statutory authorization to introduce circumstantial evidence of a person's intoxication.

Both the *Puller* court and the legislature (when it enacted AS 28.35.032(e) in response to the *Puller* decision) treated breath-test refusal as *sui generis*—as a special type of evidence unto itself. Once the supreme court decided *Puller*, it is hardly surprising that the legislature perceived the need to enact a special statute to authorize the use of this type of evidence. But the enactment of this statute does not imply that the legislature intended to bar evidence that an arrested motorist declined to cooperate with investigative efforts in some other way.

For this reason, we conclude that AS 28.35.032(e) should not be read as broadly as McCormick suggests. This statute does not prohibit the government from introducing ev-

---

1. AS 28.35.032(e) reads: "The refusal of a person to submit to a chemical test authorized under AS 28.33.031(a) or AS 28.35.031(a) or (g) is admissible evidence in a civil or criminal action or proceeding arising out of an act alleged to have been committed by the person while operating ... a motor vehicle or ... aircraft or watercraft while intoxicated."

2. 574 P.2d 1285 (Alaska 1978).

3. *See id.* at 1288.

4. SLA 1980, ch. 129, § 12.

idence of a motorist's refusal to perform field sobriety tests.[5]

■ McCormick next asserts that he was exercising his right against self-incrimination under the Alaska Constitution[6] when he refused to perform the two field sobriety tests. McCormick contends that the Municipality should have been barred from introducing evidence of his refusal to take the tests because this evidence constituted an adverse comment on his invocation of the right not to incriminate himself.

Although McCormick's argument is purportedly based on our state constitution, he fails to cite Alaska case law. Instead, he cites three Oregon cases construing the Oregon Constitution.[7] But even Oregon has rejected the claim that the right against self-incrimination protects a motorist from performing non-testimonial field sobriety tests— that is, tests which involve only demonstrations of physical coordination and ability to concentrate.[8] The majority of states agree with this conclusion.[9]

The Alaska Supreme Court has held that field sobriety tests are typically non-testimonial. In *Palmer v. State*[10], the defendant (who had been arrested for DWI) argued that the government should not have been allowed to introduce a videotape made at the police station. This videotape showed the defendant taking a breath test and performing various field sobriety tests.[11] On appeal,

the defendant contended that the videotape of the sobriety tests should have been suppressed because he was never advised of his *Miranda* rights.[12] The supreme court rejected this contention, declaring that "[t]he fifth amendment offers no protection against compulsion to take the sort of tests administered to [the defendant] in this case."[13]

It is possible to argue that, even though the *taking* of field sobriety tests is non-testimonial, a motorist's *refusal* to take the tests should be deemed a testimonial communication that is protected by the privilege against self-incrimination. But courts from other states have consistently rejected this contention. These courts hold that a defendant's refusal to take field sobriety tests is not testimonial; rather, the refusal (whether verbal or non-verbal) is conduct from which one may draw an incriminatory inference.[14]

McCormick provides no authority suggesting that the self-incrimination clause of the Alaska Constitution should be construed any differently. Accordingly, we hold that Article I, Section 9 of the Alaska Constitution does not bar the government from introducing evidence of a motorist's refusal to perform non-testimonial field sobriety tests.

■ Finally, McCormick argues that field sobriety tests constitute a "search" for purposes of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution. He contends

---

5. We note that courts from other states have reached this same conclusion. *See, e.g., State v. Wright*, 116 N.M. 832, 867 P.2d 1214, 1216–17 (App.1993), *cert. denied*, 117 N.M. 121, 869 P.2d 820 (1994); *City of Seattle v. Stalsbroten*, 138 Wash.2d 227, 978 P.2d 1059, 1064 (1999).

6. Alaska Constitution, Article I, Section 9.

7. *State v. Fish*, 321 Or. 48, 893 P.2d 1023 (1995); *State v. Gilmour*, 136 Or.App. 294, 901 P.2d 894 (1995); *State v. Green*, 68 Or.App. 518, 684 P.2d 575 (1984).

8. *See State v. Nielsen*, 147 Or.App. 294, 936 P.2d 374, 379–380, 382–83 (1997).

9. *See State v. Superior Court*, 154 Ariz. 275, 742 P.2d 286, 289 (App.1987); *State v. Taylor*, 648 So.2d 701, 704 (Fla.1995); *People v. Roberts*, 115 Ill.App.3d 384, 71 Ill.Dec. 16, 450 N.E.2d 451, 453–54 (1983); *Commonwealth v. Blais*, 428 Mass. 294, 701 N.E.2d 314, 318 (1998) ("It is

well-settled that roadside sobriety tests are considered analogous to physical (as opposed to testimonial) evidence."); *State v. Wright*, 116 N.M. 832, 867 P.2d 1214, 1215–17 (App.1994) (listing cases); *State v. Hoenscheid*, 374 N.W.2d 128, 130 (S.D.1985); *Farmer v. Commonwealth*, 12 Va.App. 337, 404 S.E.2d 371, 373 (1991); *City of Seattle v. Stalsbroten*, 138 Wash.2d 227, 978 P.2d 1059, 1062 (1999); *State v. Mallick*, 210 Wis.2d 427, 565 N.W.2d 245, 246–48 (App.1997).

10. 604 P.2d 1106 (Alaska 1979).

11. *Id.* at 1107–08.

12. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. *Palmer*, 604 P.2d at 1109.

14. See the cases listed in footnote 7, *supra*.

that, because field sobriety tests are a "search", a motorist necessarily possesses a constitutional right to refuse to cooperate in this search, and the constitution therefore bars any comment on a motorist's assertion of this right of refusal.

McCormick provides scant legal authority to support his assertion that field sobriety tests are a "search". He cites two cases from Oregon, but these were decided under the Oregon Constitution.[15] He also cites one decision of this court holding that a *breath* test is a "search" for constitutional purposes.[16]

Our own research shows that several state courts (in addition to Oregon) have held that field sobriety tests are "searches".[17] But, with two exceptions[18], all of these states treat field sobriety tests as a form of *Terry* stop.[19] Under this view, a police officer does not need probable cause before asking a motorist to perform field sobriety tests. Rather, the officer can conduct field sobriety tests based on a reasonable suspicion that the motorist is driving while intoxicated.[20]

In McCormick's case, it is fairly clear that by the time the officer asked McCormick to perform the turn-and-walk test and the stand-on-one-leg test, the officer had reasonable suspicion to believe that McCormick was driving while intoxicated. McCormick does not argue to the contrary. Indeed, because McCormick was arrested just after he refused to perform these two field sobriety tests, and because McCormick does not contest the legality of his arrest, McCormick implicitly concedes that the officer already had probable cause to arrest him when the officer asked McCormick to perform these two field sobriety tests. Thus, even if we accepted McCormick's premise that field sobriety tests are a "search" for constitutional purposes, the circumstances of McCormick's case justified the officer in conducting this search.

But in McCormick's case, the search was not "conducted"—or, at least, it was not conducted to completion. McCormick refused to perform the two physical coordination tests. We are not faced with the issue of whether the results of the tests are admissible. Rather, we are asked to decide whether the Municipality could introduce evidence of McCormick's refusal to take the two tests.

Although there is some disagreement among the states on this issue, most courts hold that a motorist has no constitutional right to refuse field sobriety tests as long as the requested field sobriety tests are non-testimonial (that is, the motorist is not required to supply verbal information but is merely required to demonstrate physical coordination and ability to concentrate), and as long as the officer's request for field sobriety tests is supported by the requisite reasonable suspicion (or, in Oregon and Colorado, by the requisite probable cause).[21] In

15. *State v. Nagel*, 320 Or. 24, 880 P.2d 451, 455 (1994); *State v. Lowe*, 144 Or.App. 313, 926 P.2d 332, 334 (1996).

16. *Leslie v. State*, 711 P.2d 575, 576–77 (Alaska App.1986).

17. See *State v. Superior Court*, 149 Ariz. 269, 718 P.2d 171, 176 (1986); *People v. Carlson*, 677 P.2d 310, 316–17 (Colo.1984); *State v. Lamme*, 19 Conn.App. 594, 563 A.2d 1372, 1374 (1989), *aff'd*, 216 Conn. 172, 579 A.2d 484 (1990); *State v. Taylor*, 648 So.2d 701, 703 (Fla.1995); *State v. Golden*, 171 Ga.App. 27, 318 S.E.2d 693, 696 (1984); *State v. Wyatt*, 67 Haw. 293, 687 P.2d 544, 550–54 (1984); *State v. Ferreira*, 988 P.2d 700, 705 (Idaho App.1999); *State v. Stevens*, 394 N.W.2d 388, 390–91 (Iowa 1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987); *State v. Little*, 468 A.2d 615, 617 (Me. 1983); *Commonwealth v. Blais*, 428 Mass. 294, 701 N.E.2d 314, 316–17 (1998); *Hulse v. State*, 289 Mont. 1, 961 P.2d 75, 86–87 (1998); *Dixon v.*

*State*, 103 Nev. 272, 737 P.2d 1162, 1163–64 (1987); *People v. Califano*, 255 A.D.2d 701, 680 N.Y.S.2d 700, 701 (1998); *State v. Gray*, 150 Vt. 184, 552 A.2d 1190, 1193–95 (1988).

18. *State v. Nagel*, 320 Or. 24, 880 P.2d 451 (1994), and *People v. Carlson*, 677 P.2d 310 (Colorado 1984).

19. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

20. See *Superior Court*, 718 P.2d at 176; *Lamme*, 563 A.2d at 1374; *Taylor*, 648 So.2d at 703; *Blais*, 701 N.E.2d at 317; *Hulse*, 961 P.2d at 86–87; *County of Dane v. Campshure*, 204 Wis.2d 27, 552 N.W.2d 876, 878–79 (App.1996).

21. See *Superior Court*, 742 P.2d at 288; *Taylor*, 648 So.2d at 703–04; *Wyatt*, 687 P.2d at 549; *Blais*, 701 N.E.2d at 317; *State v. Wright*, 116 N.M. 832, 867 P.2d 1214, 1217 (App.1993);

reaching this conclusion, courts generally rely on the rule that a lawfully-arrested suspect has no constitutional right to withhold blood and tissue samples or to refuse to demonstrate the physical characteristics of their body.[22]

McCormick does not dispute any of this; indeed, his brief does not discuss any of this. Instead, he asserts that it does not matter if he was legally obliged to perform the field sobriety tests. McCormick relies on *Elson v. State* for the proposition that the government can not rely on evidence of a defendant's refusal to consent to a search, regardless of whether the search is legal or illegal.[23] In *Elson*, the supreme court ruled that, even when a search is ultimately shown to be legal, the government should not be allowed to rely on evidence that the defendant refused to consent to the search. The court reasoned that if evidence of the defendant's non-cooperation were allowed, this might "inhibit individuals from exercising the right to refuse consent to some future illegal search".[24]

But in *Srala v. Anchorage*[25] this court held that *Elson* did not apply to a case very similar to McCormick's. The defendant in *Srala* was arrested for driving while intoxicated and later refused to allow a blood test. At trial, the government introduced evidence of the defendant's refusal. On appeal, the defendant argued that introduction of this evidence was barred by *Elson*, but this court ruled that *Elson* was distinguishable from Srala's case:

> The present case is readily distinguishable from *Elson*. In contrast to *Elson*, a person legally arrested for driving while intoxicated does not have a fourth amendment right to refuse a breath or blood test. The only fourth amendment right such a per-

son has is the right to be free of arrest on less than probable cause. [citations omitted] Consequently, [the government's] comment on the refusal of an offered blood test does not chill the exercise of fourth amendment rights. Srala was lawfully under arrest for DWI and had no constitutional right to refuse a search incident to his arrest aimed at establishing his blood alcohol level. *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). To the extent that Srala had a right to refuse a blood test, ... that right was a limited statutory right. [citations omitted] Evidence of his refusal thus did not amount to an impermissible comment on the exercise of a constitutional right.

*Srala*, 765 P.2d at 105.[26]

We applied similar reasoning in *Svedlund v. Anchorage*[27], where we upheld the constitutionality of a municipal ordinance making it a crime for a person lawfully arrested for DWI to refuse to take a breath test. We concluded that this law did not violate a motorist's Fourth Amendment rights because the breath test is a search incident to arrest—and thus, if the motorist is lawfully arrested, the motorist has no Fourth Amendment right to assert.[28]

■ Using *Srala*, *Burnett*, and *Svedlund* as guides, even if field sobriety tests are a "search", it appears that McCormick's only Fourth Amendment right was the right not to be asked to perform field sobriety tests unless the surrounding circumstances had already given the officer a reasonable suspicion that McCormick was driving while intoxicated. And if McCormick had no constitutional right to refuse to perform the field sobriety tests, then the constitution did not bar the government from introducing evi-

---

*Stalsbroten*, 978 P.2d at 1062; *Campshure*, 552 N.W.2d at 878–79.

**22.** *See, e.g., Superior Court*, 742 P.2d at 289; *State v. Burns*, 661 So.2d 842, 849 (Fla.App. 1995); *Stalsbroten*, 978 P.2d at 1062.

**23.** 659 P.2d 1195, 1199 (Alaska 1983).

**24.** *Id.* at 1199.

**25.** 765 P.2d 103 (Alaska App.1988).

**26.** *See also Burnett v. Anchorage*, 678 P.2d 1364, 1369–1370 (Alaska App.1984) (rejecting the contention that *Elson* bars the government from relying on evidence that a lawfully arrested defendant refused to take a breath test).

**27.** 671 P.2d 378, 384 (Alaska App.1983).

**28.** *See id. See also Jensen v. State*, 667 P.2d 188 (Alaska App.1983) (upholding the constitutionality of a nearly identical state statute).

dence that McCormick refused the tests. The admission of this evidence would not chill the future assertion of constitutional rights, because no constitutional right is at issue.

We admit that this issue is complex and that the resolution we have indicated here may not be entirely free from doubt. But we conclude that we need not resolve this issue in McCormick's case. As we indicated before, McCormick's briefing of this question is extremely terse. He devotes precisely one paragraph to this entire search and seizure issue. And although he cites *Elson,* he does not mention *Srala, Burnett,* or *Svedlund.*

Given the complexity of this issue, we find that McCormick's briefing is inadequate to allow meaningful review. Accordingly, we deem the issue waived.[29]

■ In addition to his constitutional challenge, McCormick also argues that evidence of his refusal to take the two field sobriety tests should have been excluded under Evidence Rule 403 because it was more prejudicial than probative. McCormick contends that this evidence was unfairly prejudicial because "[t]here was a real danger that the jury [might conclude] that McCormick's refusal to perform balance tests indicated that he was intoxicated."

This asserted "unfair prejudice" is, in fact, the proper probative value of the evidence. McCormick's refusal to perform the balance tests does not directly tend to prove his intoxication, but it does tend to prove McCormick's belief that he would be unable to satisfactorily perform the tests. From McCormick's refusal to take the two field sobriety tests, the jury could reasonably infer that McCormick believed he was under the influence of intoxicants.

This inference was not "prejudicial" for purposes of Evidence Rule 403.' To the extent that McCormick's refusal to perform the

field sobriety tests suggests that McCormick was conscious of his own intoxication, this evidence does not "[tend] to suggest decision on an improper basis".[30] Rather, this inference was a proper subject for the jury's consideration.

For all of the above reasons, we hold the admission of evidence that McCormick refused to perform the final two field sobriety tests does not require reversal of McCormick's conviction.

*Did the district court violate McCormick's right to due process when the court ordered McCormick to turn over a portion of McCormick's blood sample to the Municipality so that the Municipality could test the blood for alcohol content?*

■ Shortly after McCormick's arrest, his blood was drawn at an Anchorage hospital. Several months later, the Municipality obtained a search warrant to test McCormick's blood sample. The Municipality served this warrant on the hospital, only to discover that McCormick's attorney had earlier directed the hospital to send the entire blood sample to a laboratory in Colorado. At the Municipality's request, the district court ordered McCormick to relinquish any unused portion of the blood sample to the Municipality. The Municipality tested the blood and introduced the test result at McCormick's trial. On appeal, McCormick argues that the district court violated his right to due process when the court ordered him to relinquish the blood to the Municipality.

McCormick's argument is premised on two legal principles. First, motorists arrested for DWI have a due process right to have a sample of their blood preserved so that this blood will later be available as a potential means of rebutting the government's evidence that the motorist was intoxicated or had a blood-alcohol level of .10 percent or greater.[31] Second, unless the motorist

29. See *Katmailand, Inc. v. Lake and Peninsula Borough,* 904 P.2d 397, 402 n. 7 (Alaska 1995); *Wren v. State,* 577 P.2d 235, 237 n. 2 (Alaska 1978); *Kristich v. State,* 550 P.2d 796, 804 (Alaska 1976); *Lewis v. State,* 469 P.2d 689, 691–92 (Alaska 1970).

30. Commentary to Evidence Rule 403, fifth paragraph.

31. See *Snyder v. State,* 930 P.2d 1274 (Alaska 1996); *Anchorage v. Serrano,* 649 P.2d 256 (Alaska App.1982).

chooses to have blood drawn, the government has no authority to draw blood from them.[32]

Based on these principles of law, McCormick argues that motorists who choose to have a sample of their blood drawn should not have to face the possibility that the government will later obtain and test a portion of this blood sample. McCormick contends that motorists will be deterred from exercising their due process right to have a sample of their blood preserved if they know that this blood may one day become available to the government. According to McCormick, if courts are allowed to issue subpoenas and search warrants for the blood, this will "have a severe chilling effect on the exercise of [a motorist's] constitutional due process rights".

McCormick's argument is answered by this court's decisions in *Cunningham v. State* [33] and *Birch v. State* [34].

The defendant in *Cunningham* was arrested for driving while intoxicated. After he submitted to a breath test, he was informed that he had a right to an independent blood test. Cunningham exercised this right; he was transported to a hospital, where his blood was drawn and stored. Later, the State of Alaska obtained a search warrant for this blood; a state laboratory technician tested the blood for alcohol content, and the test result was used against Cunningham at his trial.[35]

On appeal, Cunningham argued that when a motorist exercises the right to an independent blood test, the resulting blood sample should be used only for the motorist's benefit and the State should not be able to obtain access to the blood. We rejected this argument. We noted that a motorist's right to an "independent" blood test does not mean that the resulting blood sample is privileged; rather, it means that the motorist is entitled to have the sample tested by people and methods that are not subject to government manipulation.[36] We further noted that, although Alaska statutes forbid the government from obtaining a blood sample from a non-consenting motorist, no statute bars the government from using court process to obtain and test the blood sample of a motorist who does consent to a blood test.[37]

In *Birch,* the facts were similar to *Cunningham* except that the arrested motorist consulted an attorney before deciding to have a blood sample drawn and preserved. On appeal, Birch argued that the resulting blood sample was protected by the attorney-client privilege, but we rejected this argument. We held that, although the attorney-client privilege would protect the results of any defense-initiated testing of the blood sample, the sample itself was not privileged. Thus, if the court issued a search warrant for the blood, the government could seize a portion of the sample, test it, and use the results against the motorist.[38]

McCormick's case is different from *Cunningham* and *Birch* in one respect. McCormick's blood sample was not in the hands of a hospital or other third party; rather, it was being held by a laboratory hired by McCormick's attorney. But in *Morrell v. State,* the Alaska Supreme Court held that a defense attorney has no privilege to take delivery of physical evidence from third parties and then withhold the physical evidence from the government.[39] Based on this court's decisions in *Cunningham* and *Birch,* and based on the supreme court's decision in *Morrell,* we hold that the district court acted lawfully when it ordered McCormick's attorney to surrender the unused portion of the blood sample so that the blood could be tested by the Municipality.

**32.** *See Pena v.* State, 684 P.2d 864 (Alaska 1984). The *Pena* decision was later modified by the enactment of AS 28.35.035, but this statute does not apply to McCormick's case.

**33.** 768 P.2d 634 (Alaska App.1989).

**34.** 825 P.2d 901 (Alaska App.1992).

**35.** *Cunningham,* 768 P.2d at 634–35.

**36.** *See id.* at 636.

**37.** *See id. .*

**38.** *Birch,* 825 P.2d at 902–03.

**39.** 575 P.2d 1200, 1210–11 (Alaska 1978).

*Did the district court violate McCormick's right to due process when the court prohibited McCormick's attorney from arguing to the jury that the government's blood sample might have been tainted, or its alcohol content altered, while the blood was in the possession and control of McCormick's agents?*

As explained above, shortly after McCormick's arrest, his blood was drawn at an Anchorage hospital. A few days later, at the direction of McCormick's attorney (and unbeknownst to the Municipality), the blood was shipped to a laboratory in Colorado so that it could be tested by defense experts. Several months later, when the Municipality discovered that the blood was gone, the Municipality applied for a court order directing the defense attorney to return the blood to Anchorage so that it could be tested by the Municipality. At McCormick's trial, the Municipality introduced the result of this second blood test. That blood test showed McCormick's blood contained .125 percent alcohol.

■ As the parties were preparing for opening statements at McCormick's trial, the defense attorney asked the trial judge to preclude the Municipality from introducing evidence of this blood test. McCormick's attorney argued that, because the blood had been in the possession of the Colorado laboratory for several months, the Municipality could not establish a proper chain of custody for this evidence. The defense objection was based on Alaska Evidence Rule 901(a). This rule states that "[w]henever the prosecution in a criminal case offers ... [physical] evidence which is of such a nature ... as to be susceptible to adulteration, contamination, modification, ... or other changes in form attributable to accident, carelessness, error or fraud", the prosecution must, as a foundational matter, "demonstrate [to a] reasonable certainty that the evidence is ... free of [these] possible taints".

*Defense Attorney:* I would move to ... to exclude evidence related to the blood on the assumption that the prosecution is not going to be able to provide any kind of evidence with respect to the chain of custody of the blood once it [was sent to Colorado] until it was returned to [Anchorage],

and to ensure ... [the] integrity [of the] blood sample.... Our position would be that [the blood evidence] simply shouldn't come in because the prosecution is going to be unable to link the chain of custody [during this] time [.]

Now, the court could either do one of two things, I suppose. [The court could rule] that since [the blood] was sent out [of state] at the request of the defense, ... perhaps that should excuse the prosecution from establishing the integrity of the sample between the time that it left [Anchorage] and the time that it was returned 10 months later. Or, the court could preclude the prosecution from seeking to admit it. But I just wanted to get a ruling on [this issue] now, because if the court is inclined not to allow the blood [evidence] ... based on that [chain of custody] issue alone, ... then ... I'd ask for an order precluding the prosecution from even talking about the blood in [their] opening [statement].

The real issue here is just whether or not the [blood] test evidence [will] be admissible over [our] objection [based on] the lack of chain of custody.

The trial judge ruled that, given the facts of the case—particularly, the fact that the blood had been sent to Colorado at the behest of McCormick's attorney and had been stored there in the custody of a laboratory hired by the defense attorney—the Municipality would be excused from establishing the integrity of the blood sample during the months it was in the custody of the defendant's agents.

*The Court:* I find [that the blood evidence] will be [admissible]. I find [that] it should be.... I find that, because the only entity that would be able to address the issue of [the integrity of the blood sample] is [under] the control of [the defense attorney] and Mr. McCormick, [the government] does not have to address the issues of chain of custody with respect to the time [the blood sample] left the [Anchorage hospital] lab and the time it came back to the lab.... They should not be put in the position of having to necessarily fill that link of the chain, because it wasn't

a chain link that they put in place in the first place.

This issue came up again when the defense attorney was delivering his summation to the jury. During his summation, McCormick's attorney attempted to cast doubt on the validity of the Municipality's blood test by pointing out that the jury had heard no evidence concerning the methods used to preserve the blood during its transportation and its months of storage and handling in Colorado. The municipal prosecutor immediately objected:

*Defense Attorney:* Now, the blood test. What we have is a situation where Mr. McCormick had his blood drawn willingly. He was requested to do so, and he did it. And the blood was shipped out of state. We don't know what it was—[.] ... [It has been] stipulated that it's the same blood that came back, but we do not know what happened to the blood while it was gone. Absolutely no ...

*Prosecutor:* I object to this, Your Honor ...

*The Court:* Sustained.

McCormick's attorney offered no counter-argument at the time. However, after the parties completed their summations to the jury, the defense attorney responded to the court's ruling:

*Defense Attorney:* [An] issue, Your Honor, [that] I wanted to bring up is there was an objection during my closing [argument], when I was attempting to argue that nobody knows what happened to this ... blood while it was at the lab out of state.

*The Court:* Yes.

*Defense Attorney:* And my understanding of your prior rulings on this issue is that you were going to instruct the jury that ... [the] blood sample that was sent out of the state was the same sample that came back ... to [Anchorage]. But ... I did not understand there to be any preclusion from arguing as to what may or may not have happened to that sample in the interim.

*The Court:* ... [I]n my view, there was a preclusion as to ... what was done to

[the blood] at the lab [in Colorado].... [The prosecutor] requested [that], if [the integrity of the blood sample was going to be disputed], then we'd need to get into the issue of your sending it out [of state], that you sent out two samples instead of one, that the lab was [of your choosing]—if there was some problem with what the lab did, it's because it was a lab that you selected, [whether] you ... selected a good lab or a bad lab. All of those sorts of issues were precluded by basically saying that this is the same sample that came back [to Anchorage], and we're not going to discuss what happened [to the blood] when it ... went out, or ... what happened [when] it was out of state. So, ... in my view, ... there was a preclusion of discussion of those issues. And maybe that wasn't as clear as it should have been, but that was ... part and parcel of [my ruling]—all of that ball of wax.

*Defense Attorney:* Okay. All right. I didn't understand that to be the case. That's why I started arguing to that effect.

*The Court:* All right.

On appeal, McCormick argues that the trial judge's ruling denied him due process of law. McCormick contends that, because the Municipality relied on the result of the Anchorage blood test, McCormick was entitled to attack that test result by pointing out, first, that the blood sample was tested many months after it was drawn from McCormick's body, and second, that the Municipality failed to present evidence concerning the precautions (if any) that were taken to ensure the chemical integrity of the blood sample during this time.

From the portions of the record quoted above, it is clear that McCormick did not preserve this issue in the district court. At the beginning of trial, McCormick's attorney attempted to exclude the blood evidence, arguing that the Municipality would be unable to prove that the blood sample had not become tainted or altered during the many months that it was in the hands of the defense attorney's agents (the Colorado laboratory). But the trial judge excused the Municipality from establishing the integrity of the blood sample during the months that it

was in Colorado. The judge noted that the break in the chain of custody was caused by McCormick, and that the blood was held in the custody of the defendant's agents. McCormick has not challenged this ruling on appeal.

At the end of trial, the defense attorney attempted to use this ruling against the government—by asking the jury to view the Municipality's blood-test evidence with suspicion because the Municipality had introduced no evidence to establish the integrity of the blood while it was stored in Colorado. The trial judge sustained the prosecutor's objection to this argument. When McCormick's attorney later asserted that his argument had been proper, the trial judge responded that the defense attorney's argument was precluded by the earlier chain-of-custody ruling. Hearing this, the defense attorney did not disagree with the trial judge, nor did he seek reconsideration of that prior ruling. He merely stated, "Okay. All right. I didn't understand that to be the case."

In other words, McCormick's attorney never told the trial judge that he believed the judge's ruling was wrong, nor did he assert that the judge had imposed an unconstitutional restriction on McCormick's argument to the jury. McCormick thus failed to preserve an objection to the trial judge's ruling regarding the scope of his argument.[40] This being so, McCormick can prevail on appeal only if he demonstrates that the trial judge's ruling was plain error.[41]

■ We find no plain error here. The trial judge ruled at the beginning of McCormick's trial that the Municipality would be excused from establishing the integrity of the blood sample during its transportation to and from Colorado and during the many months that it was stored there by a laboratory working under contract for the defense attorney. In reliance on this ruling, the Municipality did not introduce evidence pertaining to the shipment, storage, and testing of the blood sample during its Colorado sojourn. Then, in final argument, the defense attorney tried to take unfair advantage of this ruling—by arguing to the jury that they should view the government's evidence with suspicion because the government made no attempt to account for the integrity of the blood sample while it was in Colorado.

We are not saying that McCormick had no right to question whether the blood sample might have become tainted while it was in the hands of his own agents. But McCormick chose not to litigate this issue. Instead, he accepted the trial judge's ruling that the government was excused from establishing the integrity of the sample during those months. McCormick implicitly concedes that the ruling was correct or, at least, that it was a proper exercise of the judge's discretion. Under these circumstances, the trial judge did not violate McCormick's right to procedural fairness when he precluded McCormick from attacking the sufficiency of the government's proof on this issue during final argument.

### Does the mandatory forfeiture provision of AMC § 9.28.020(C)(5) violate state law?

■ At McCormick's sentencing, the district court ordered forfeiture of the motor vehicle he drove while intoxicated. This forfeiture was ordered pursuant to AMC § 9.28.020(C)(5)(b), an ordinance that governs sentencing for the municipal crime of driving while intoxicated. This ordinance declares that if a defendant has previously been convicted of driving while intoxicated (or breath-test refusal) within the preceding ten years[42], and if the defendant has any interest in the vehicle that was used in the commission of the offense, the court shall order forfeiture of the defendant's interest in the vehicle.

---

**40.** *Hagans, Brown, & Gibbs v. First Nat'l Bank of Anchorage,* 783 P.2d 1164, 1166 n. 2 (Alaska 1989) ("Issues not properly raised ... at trial are not properly before this court on appeal."); *Wettanen v. Cowper,* 749 P.2d 362, 364 (Alaska 1988).

**41.** *Burford v. State,* 515 P.2d 382, 383 (Alaska 1973); *Lumbermens Mutual Casualty Co. v. Continental Casualty Co.,* 387 P.2d 104, 109, 111–12 (Alaska 1963).

**42.** AMC § 9.28.020(E)(4) limits relevant convictions to those within the ten years preceding the date of the present offense.

McCormick claims that this provision of municipal law violates the Alaska Constitution. He points out that, when a defendant is convicted of DWI under state law, the sentencing court has the power to order forfeiture of the defendant's vehicle only if the defendant has previously been convicted two or more times.[43] Moreover, while the sentencing court has the power to order forfeiture of the defendant's vehicle, forfeiture is not mandatory.[44] Based on these differences in the sentencing provisions of state and municipal law, McCormick argues that the municipal forfeiture provision violates the rule that state law takes precedence over municipal law.

McCormick relies on the Alaska Supreme Court's decision in *Kodiak v. Jackson*.[45] In *Jackson*, the supreme court struck down a provision of a municipal assault statute which required a mandatory minimum sentence of imprisonment for a person convicted of assaulting a police officer. The court held that this mandatory minimum punishment was inconsistent with the power to suspend sentences of imprisonment given to sentencing judges by state statute (AS 12.55.080—085).[46] McCormick argues that the rule applied in *Jackson* likewise calls for invalidation of the Anchorage forfeiture provision.

However, *Jackson* itself recognizes that a municipal ordinance is not necessarily illegal simply because it is inconsistent with state law. Rather, as *Jackson* acknowledges, the true test is whether the municipal ordinance is irreconcilably at odds with state law, so that enforcement of the municipal provision defeats the operation of state law.[47]

That is not the case here. The Alaska Legislature has enacted AS 28.35.038, which specifically provides that, "[n]otwithstanding other provisions of [Title 28], a municipality may adopt an ordinance providing for the impoundment or forfeiture of a motor vehicle ... involved in the commission of [DWI or breath-test refusal]", and that such an ordinance "is not required to be consistent with [Title 28 of the Alaska Statutes] or regulations adopted under [that] title". Because the legislature has explicitly granted municipalities the power to enact forfeiture ordinances that are inconsistent with the corresponding provisions of state law, municipalities do not violate state law when they exercise this power.[48]

McCormick presents an alternative argument. He contends that, even though AS 28.35.038 may authorize municipalities to impose harsher forfeitures than would be imposed under state law for the offense of driving while intoxicated, AS 28.35.038 only authorizes municipalities to ignore the provisions of Title 28 and the state regulations promulgated under it. The statute says nothing about authorizing municipalities to ignore the provisions of Title 12—specifically, the provisions of AS 12.55.080 and 085 that empower sentencing judges to suspend the imposition or the execution of sentence.

■■■ It is true that AS 28.35.038 does not specifically mention these two provisions of Title 12. However, the statute must be interpreted in the context of the various DWI and breath-test refusal statutes contained in AS 28.35. As we recently stated,

> The guiding principle of statutory construction is to ascertain and implement the intent of the legislature. When a statutory provision is part of a larger framework, even seemingly unambiguous language must be interpreted in the context of the other portions of the [whole]. *Millman v. State*, 841 P.2d 190, 194 (Alaska App.1992).

*Sakeagak v. State*, 952 P.2d 278, 284 (Alaska App.1998).

---

**43.** *See* AS 28.35.036(a).

**44.** *See* AS 28.35.036(c).

**45.** 584 P.2d 1130 (Alaska 1978).

**46.** *Id.* at 1133.

**47.** *Id.* at 1132 (quoting *Jefferson v. State*, 527 P.2d 37, 43 (Alaska 1974)).

**48.** For the same reason, the Anchorage forfeiture provision does not violate AS 28.01.010(a), which states that "[a] municipality may not enact an ordinance that is inconsistent with the provisions of this title or the regulations adopted under this title."

With regard to the offenses of driving while intoxicated and refusing to submit to a breath test, the Alaska Legislature has enacted a series of escalating mandatory minimum punishments (both imprisonment and fines) for all offenders, even first offenders. Thus, for these two crimes, the legislature has taken away a sentencing court's power to suspend imposition of sentence and has substantially abridged a sentencing court's power to suspend execution of sentence.

Municipalities are generally authorized under AS 28.01.010 to enact traffic laws consistent with Title 28. Because of this authorization, a municipality does not violate the sentencing provisions of AS 12.55.080—085 if it follows the lead of the Alaska Legislature and enacts mandatory jail sentences and mandatory fines for the offenses of DWI and breath-test refusal.

We must interpret AS 28.35.038 against this backdrop. Had the legislature never enacted AS 28.35.038, municipalities would still be authorized to impose vehicle impoundments and forfeitures for the offenses of driving while intoxicated and refusing a breath test, providing these impoundments and forfeitures were consistent with the corresponding state penalties. By enacting AS 28.35.038, it appears that the legislature intended to authorize municipalities to impose impoundments and forfeitures for these two offenses that are harsher than those that can be imposed under state law.

In his brief to this court, McCormick suggests that the final sentence of AS 28.35.038 was not intended to authorize municipalities to impose harsher penalties than the ones provided under state law. McCormick suggests instead that the purpose of that final sentence was to authorize municipalities to make impoundment and forfeiture of vehicles a part of the punishment for violations of municipal DWI and breath-test refusal laws.

McCormick's interpretation ignores AS 28.01.010, which authorizes municipalities to enact their own traffic laws, so long as those laws are consistent with state law. As indicated above, we believe that even if AS 28.35.038 had never been enacted, municipalities would have been authorized to enact sentencing provisions for DWI and breath-test refusal that included discretionary forfeiture of vehicles.

McCormick's interpretation also overlooks the first sentence of AS 28.35.038, which declares that municipalities may adopt ordinances "providing for the impoundment or forfeiture of a motor vehicle ... involved in the commission of *an offense under AS 28.35.030, 28.35.032, or an ordinance with elements substantially similar to AS 28.35.030 or 28.35.032.*" That is, AS 28.35.038 not only authorizes municipalities to adopt ordinances for the forfeiture of a vehicle used in violation of a municipal DWI or breath-test refusal law; the statute also expressly authorizes municipalities to adopt ordinances for the forfeiture of vehicles used in violation of the *state* DWI or breath-test refusal laws.

Given this legislative context, we conclude that the purpose of the final sentence of AS 28.35.038 is to authorize municipalities to enact vehicle impoundment and vehicle forfeiture laws that are harsher than their state-law counterparts. We further conclude that these harsher penalties can include the mandatory forfeiture of a vehicle involved in either the offense of driving while intoxicated or the offense of breath-test refusal. The legislature has enacted mandatory minimum punishments for these two offenses, thus restricting the courts' authority to suspend sentence for these two crimes. Given this legislative policy, and given our conclusion that the final sentence of AS 28.35.038 was intended to authorize municipalities to impose even more onerous impoundments and forfeitures, we conclude that the legislature's failure to specifically mention AS 12.55.080—085 in the wording of AS 28.35.038 does not manifest a legislative intent to bar municipalities from enacting mandatory forfeitures.

 McCormick raises two final attacks on the mandatory forfeiture provision. First, he notes that his vehicle was worth more than $5000, and that he received a separate fine ($1500 with $750 suspended). McCormick therefore argues that he was subjected to a total monetary penalty exceeding the maximum fine for driving while intoxicated ($5000). We rejected this same

argument in *Hillman v. Anchorage.*[49] In *Hillman,* we held that a vehicle forfeiture is not the equivalent of a fine, nor is a vehicle forfeiture to be combined with a fine for purposes of determining whether a defendant's fine exceeds the $5000 limit. We reaffirm our decision in *Hillman.*

■ Second, McCormick asserts that forfeiture of a $5000 vehicle is grossly disproportionate to the offense of driving while intoxicated, and that therefore the forfeiture represents an "excessive fine" of the kind prohibited by the Eighth Amendment.[50]

In *Hillman,* we held that forfeiture of a vehicle worth $8000 did not represent an excessive punishment for a defendant convicted of his third DWI. We noted that the Ohio courts had upheld the forfeiture of a vehicle valued at between $23,000 and $30,000 when the defendant was convicted of his fourth DWI.[51] Here, McCormick is a repeat DWI offender who has suffered forfeiture of a vehicle worth $5000. This forfeiture is not so "grossly disproportionate" as to run afoul of the Eighth Amendment.

*Conclusion*

The judgement of the district court is AFFIRMED.

---

**49.** 941 P.2d 211, 217 (Alaska App.1997).

**50.** *See Alexander v. United States,* 509 U.S. 544, 558–59, 113 S.Ct. 2766, 2775–76, 125 L.Ed.2d 441 (1993) (holding that *in personam* forfeitures are limited by the Eighth Amendment); *Harmelin v. Michigan,* 501 U.S. 957, 996–1005, 111 S.Ct. 2680, 2702–07, 115 L.Ed.2d 836 (1991) (interpreting the Eighth Amendment to forbid only "extreme sentences that are grossly disproportionate to the crime").

**51.** *Hillman,* 941 P.2d at 217.